Adelia GUISTI, Plaintiff,

v.

GENERAL ELECTRIC COMPANY and The Travelers Insurance Company, Defendants.

No. 89–CV–1184.

United States District Court, N.D. New York.

March 15, 1990.

Ernest and George Abdella, George Abdella, of counsel, Gloversville, N.Y., for plaintiff.

Townley & Updike, Lawrence C. Fox, of counsel, New York City, for defendants.

## MEMORANDUM—DECISION AND ORDER

McCURN, Chief Judge.

### Introduction

This is an action for the recovery of accidental death benefits under an insurance policy issued by The Travelers Insurance Company ("Travelers") to the General Electric Company ("GE") for the benefit of GE's employees. The plaintiff, Adelia Guisti, is the widow of Raymond Guisti, a GE employee who died on November 28, 1988. It is not disputed that the decedent was covered by the policy at the time of his death and that his wife was the named beneficiary. Mrs. Guisti has brought suit against GE and The Travelers on the assertion that she has been wrongfully denied $50,000 in accidental death benefits due under the terms of the policy. The defendants contend that under the facts of this case and the terms of the policy Mrs. Guisti is not entitled to receive benefits.

Plaintiff initially filed this suit as a state law claim in the Supreme Court of the State of New York, Montgomery County. The defendants subsequently removed the action to federal court on the basis that the cause of action was preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* On January 2, 1990, the court filed an order denying plaintiff's motion to remand on the basis that the action is one for the collection of benefits due under an ERISA covered employee benefit plan—federal question jurisdiction being based upon 29 U.S.C. § 1132(e). Though not originally framed as an ERISA action, the parties now agree that the plaintiff's claim for benefits must be considered as an action pursuant to 29 U.S.C. § 1132(a)(1)(B). "That provision allows a suit to recover benefits due under the plan, to enforce rights under the terms of the plan, and to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract." *Firestone Tire and Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). Presently before the court are cross motions for summary judgment. The parties have not engaged in discovery.

### Background

Most of the facts are not in dispute. On November 19, 1988, Mr. Guisti, along with four friends, traveled to a hunting lodge located in Cherry Valley, New York. The group spent the night at the cabin as they were planning to begin hunting the next day. The cabin was equipped with a propane gas refrigerator that apparently leaked carbon monoxide. The following morning Mr. Guisti awoke with a headache, nausea and vomiting, chest pain and shortness of breath. The other members of the group also had headaches, nausea, and vomiting but they apparently did not have chest pains. While Mr. Guisti remained ill, the symptoms of the others cleared. Mr. Guisti's companions took him to a store in Cherry Valley and called an ambulance which transported him to Mary Imogene Bassett Hospital in Cooperstown, N.Y.

Mr. Guisti spent eight days in the hospital before his death due to heart failure on the morning of November 28, 1988. The key issue presented in this suit is whether Mr. Guisti's death was an accidental death of the sort which is covered by the terms of the insurance policy. There is a dispute over the precise cause of Mr. Guisti's death. As will be discussed more thoroughly below, the defendants assert that he died, at least in part, due to an "underlying coronary artery disease." The plaintiff claims that the death was a result of damage to the heart muscle tissue caused by carbon monoxide poisoning. No autopsy was performed.

The parties both focus on two portions of "The Travelers/General Electric Personal Accident Insurance Plan for Accidental Death and Dismemberment (As Amended June 27, 1988)." The first portion, which discusses the scope of coverage afforded by the plan states:

Benefits will be paid for bodily injury, either on or off the job, *caused solely by accidental, violent and external means,* and, independently of all other causes, resulting in death.... *[N]o benefits will be payable if the death or loss is contributed to by disease ...*

The parties are in dispute as to whether this clause excludes from coverage the type of death suffered by Mr. Guisti. The second policy provision, which discusses the responsibility of The Travelers to administer and manage claims under the plan states:

The carrier will make all determinations with respect to benefits under this Plan. Accordingly, the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision for full and fair review of claim denial pursuant to Section 503 of [ERISA], shall be vested in the carrier.

As will be discussed, the defendants assert that this provision provides The Travelers with discretionary authority to make determinations on claims which may only be overturned by a reviewing court if they are "arbitrary and capricious."

As the named beneficiary to Mr. Guisti's accidental death insurance policy, the plaintiff filed a claim with GE for $50,000 in benefits allegedly due under the policy in May of 1989. Along with the insurance claim the plaintiff forwarded to GE copies of the medical records from Mr. Guisti's hospitalization. These documents were transferred to The Travelers's claim department who in turn forwarded the file to Dr. Gerald Blank M.D. of The Travelers medical staff. Dr. Blank was also provided with a copy of the "relevant policy language" and asked for his opinion as to whether Mr. Guisti's death was covered by the terms of the policy. After reviewing the hospital record Dr. Blank concluded that:

There is no doubt that this unfortunate gentleman died of his Myocardial Infarction which resulted directly from the hypoxia of carbonmonoxide poisoning. However, as stated in the discharge summary "Carbonmonoxide poisoning in the face of underlying coronary artery disease."

Under section 1 of the Personal Accident Insurance Plan it states "no benefits will be payable if the death or loss is caused or contributed to by disease, ...". In my opinion this death comes under this exclusionary statement. The statement *of the discharging physician would support that opinion.*

Memorandum of Gerald I. Blank M.D., Exhibit F of the 2/1/90 Affidavit of Lawrence C. Fox ("Fox Affidavit"). In a letter dated June 27, 1989, The Travelers denied the plaintiff's claim for accidental death benefits on the basis that the "insured's death was caused or contributed to by [underlying coronary artery] disease." Letter of Eva Magnano, Exhibit G of the Fox Affidavit. However, the letter recognized that the heart failure "resulted directly from the hypoxia of carbon monoxide poisoning." *Id.* The letter also informed the plaintiff of her ability to appeal the claim within 60 days by submitting any additional documents or records which she felt might support her claim. The plaintiff did not appeal The Travelers's decision, initiating this law suit on August 1, 1989.

A potentially important factual dispute has arisen with respect to the precise cause of Mr. Guisti's death. This factual dispute could, in turn, impact upon whether the cause of death is one which is covered by the terms of the insurance policy. After a review of the hospital records the defendants, while "presently" recognizing that the decedent was exposed to carbon monoxide, concluded that "there is also no doubt that Mr. Guisti had a history of chest pain and coronary artery disease prior to the exposure." Affidavit of Fox par. 9. As stated by the defendants:

In the "Emergency Services Record" prepared when Mr. Guisti arrived at the hospital (Exhibit D), the nurse reported (presumably based on information supplied by Mr. Guisti himself) that he had a "Hx [history] of chest pain on exertion recently." A doctor who saw him that first day also reported a "Hx of one month of what sounds like exertional angina" and stated an initial diagnosis of "angina/myocardial dysfunction; CO [carbon monoxide] poisoning [with] *underlying CAD [coronary artery disease* ]; pulmonary edema." (Exhibit E.) Another doctor later confirmed that prior to admission Mr. Guisti had "a month or so history of chest pain" on exertion. (Exhibit C.)

*Id.* (Emphasis in original). The defendants also assert that they relied on the fact that the other members of the hunting party did not die as further proof that Mr. Guisti's death was caused by coronary artery disease. Defendant's Mem. of Law at 16.

The plaintiff, on the other hand, asserts that decedent's heart failure was caused by accidental carbon monoxide poisoning—not coronary heart disease. Mr. Guisti was 46 years old at the time of his death. In her February 16, 1990, Affidavit, Adelia Guisti states that she lived with Mr. Guisti almost every day of their married life and that at no time did he complain of chest pains or was he treated for any heart condition or similar complaint. *Id.* par. 3. The decedent's nephew, who was with him on the hunting trip, asserts that he "never [knew his] Uncle to complain of chest pains prior to [the hunting cabin] incident, and I have seen him almost each and every day." February 16, 1990, Affidavit of David Guisti, par. 6. While questioning whether the decedent ever really had chest pains, the plaintiff emphasizes that the hospital records only reveal the existence of chest pains for one month, and only then, upon exertion. The plaintiff appears to question whether these facts actually support a conclusion that the decedent had underlying coronary artery disease.

The plaintiff has submitted the affidavit of Dr. Gary Weaver M.D. dated January 15, 1990, who was one of the decedent's treating physicians at Mary Imogene Bassett Hospital ("Affidavit Weaver"). The affidavit is based upon a review of the hospital records as well as the personal experience of the doctor. Dr. Weaver states that the decedent, at his November 20, 1988, emergency room admission, related a one month history of intermittent chest pain though he lacked a previous history of heart disease. This, along with the fact that the other members of the hunting group were not as severely ill caused Dr. Weaver to "assume" that Guisti had underlying coronary artery disease which made him more susceptible to carbon monoxide poisoning. Affidavit Weaver, page 5.

Dr. Weaver states that carbon monoxide molecules bind tightly with hemoglobin protein in the blood—limiting the capacity of the hemoglobin to carry oxygen to the tissues. Moreover, carbon monoxide also binds with an oxygen storing protein called myoglobin which is found in the heart muscle. Death from carbon monoxide poisoning, according to Dr. Weaver, usually occurs due to brain or heart failure which results from a lack of sufficient oxygen. The medical conclusion reached by Dr. Weaver is that:

> The cause of Mr. Guisti's death can best be described as occurring from severe myocardial damage caused by inhalation of carbon monoxide (carbon monoxide limiting the oxygen transporting capacity of blood, the resulting oxygen deficiency causing heart muscle injury). Undiagnosed coronary artery disease could have been present. If it [was] present it would have made Mr. Guisti more sensitive to the toxic effects of carbon monoxide. If Mr. Guisti had underlying coronary artery disease this would likely have been treatable with medical or surgical therapy and he would be alive today except [for] the carbon monoxide exposure.

Affidavit Weaver, page 7.

Dr. Weaver asserts that Mr. Guisti's illness and resulting death could be "explained entirely from carbon monoxide tox-

icity without invoking coronary artery disease." Affidavit Weaver, page 5. The basis for this statement is Dr. Weaver's reverse extrapolation of the carboxyhemoglobin level in Mr. Guisti's blood from the time his carboxyhemoglobin level was first tested at the hospital. Dr. Weaver believes that Mr. Guisti's carboxyhemoglobin level when he first exited the hunting cabin was 48.03%—a concentration which could be fatal to a person without coronary artery disease.

### Discussion

The parties do not now dispute that plaintiff's action is based on 29 U.S.C. § 1132(a)(1) which provides that a "civil action may be brought ... by a participant or a beneficiary [of an ERISA covered plan] ... (B) to recover benefits due to him under the terms of his plan." The insurance plan which is the subject of this dispute is an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1). The plaintiff, as the named beneficiary under the plan is entitled to bring suit for the recovery of benefits pursuant to § 1132(a)(1)(B)—all state statutory and common law remedies being preempted. *See Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 324–26 (2nd Cir.1985), *aff'd without opinion*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986); *Schwartz v. Newsweek, Inc.*, 827 F.2d 879, 881 (2nd Cir.1987). It is also clear that The Travelers, in accordance with the express terms of the policy, is the administrator of the ERISA covered plan and is therefore an ERISA fiduciary. 29 U.S.C. §§ 1002(14), (16). ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1).

### A. Standard of Review

Until recently it was well settled in the Second Circuit, and in almost every other federal circuit court, that "[i]n actions challenging the denial of benefits under an ERISA plan, review is limited to determining whether the administrator's decision was arbitrary and capricious." *Schwartz v. Newsweek, Inc.*, 827 F.2d at 881; *Accardi v. Control Data Corp.*, 836 F.2d 126, 128 (2nd Cir.1987). However, the Supreme Court recently rejected the arbitrary and capricious standard of review when it held *"that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). The Court went on to state that:

> the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor[ ] in determining whether there is an abuse of discretion."

*Id.*

Prior to the Supreme Court's decision in *Firestone* the rigid application of the arbitrary and capricious standard had been criticized and debated by a number of circuit courts. *See e.g., Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1049–53 (7th Cir.1987); *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 137–145 (3rd Cir.1987) *aff'd* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (Third Circuit's decision to deviate from arbitrary and capricious standard which was based on a concern for impartiality on the part of the ERISA administrator was not the basis for the Supreme Court's decision). Though the Supreme Court held that a *de novo* standard of review was applicable based on "established principles of trust law," *Firestone*, 109 S.Ct. at 956, the Court also pointed out that "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' ... and 'to protect contractually defined benefits.' " *Id.* at 955 (citations

omitted). In doing so the Court revealed how odd the adoption of the arbitrary and capricious standard would be since it "would require [courts] to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* at 956.

The defendants assert that this court should apply the arbitrary and capricious standard when reviewing their decision to deny plaintiff's claim for benefits. Defendants contend that the express language of the insurance policy gives The Travelers "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone*, 109 S.Ct. at 956, thereby making the arbitrary and capricious standard applicable. Numerous post *Firestone* courts in other circuits have applied the arbitrary and capricious standard on the basis that the plan document vested the plan fiduciary with discretionary authority to make benefit determinations and interpret the terms of the plan. *See e.g., Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38–39 (11th Cir.1989); *Batchelor v. Internat'l Brotherhood of Electrical Workers*, 877 F.2d 441, 442–43 (5th Cir.1989). However, this court does not find that the language of the plan, in this particular situation, provides the plan administrator with the express discretionary authority necessary to make the deferential arbitrary and capricious standard applicable.

The *Firestone* court held that the *de novo* standard applies unless the plan expressly gives the administrator "the power to construe uncertain terms or [provides] that eligibility determinations are to be given deference." *Firestone*, 109 S.Ct. at 954. When the ERISA fiduciary is given such discretion " '*by the instrument* under which they act' " ... "the [fiduciary's] interpretation will not be disturbed if reasonable." *Id.* (quoting *Nichols v. Eaton*, 91 U.S. 716, 724–25, 23 L.Ed. 254 (1875). The defendants cite Section VI of the Travelers/General Electric accidental death policy as the source of their discretionary authority. That section states in part:

The carrier will make all determinations with respect to the benefits under this Plan. Accordingly, the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of the claim denial pursuant to Section 503 of [ERISA] shall be vested in the carrier.

Though this language clearly provides The Travelers with the responsibility (as opposed to GE) to adjust claims made by beneficiaries under the policy, there is no language in this clause which gives The Travelers a clear grant of discretion to "construe uncertain terms" or which instructs courts that eligibility determinations made by The Travelers "are to be given deference." Terms *such as* "discretion", "deference", or "power to interpret" are not found in this clause.

In the post *Firestone* cases cited by the defendants, which applied the arbitrary and capricious standard, the ERISA plans generally contained a more express grant of discretion to the fiduciaries. In *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689 (6th Cir.1989), the ERISA plan stated:

In case of any factual dispute hereunder, the Retirement Committee shall resolve such dispute giving due weight to all evidence available to it. The retirement Committee *shall interpret the Plan* and shall determine all questions arising in the administration, *interpretation* and application of the Plan. *All such determinations shall be final, conclusive and binding* except to the extent that they are appealed under the ... claim procedure.

*Id.* at 694 (emphasis added). The court in *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37 (11th Cir.1989) noted that the plan conferred upon the trustees " 'full power to construe the provisions of [the] Trust.' " *Id.* at 39; *See also Batchelor v. Intern. Broth. of Elec. Workers Local 861*, 877 F.2d 441, 443 (5th Cir. 1989) (plan stated that ERISA fiduciaries "have full power to construe the provisions

of this Agreement, [and] the terms used herein"); *Lowry v. Bankers Life and Cas. Retirement Plan*, 871 F.2d 522, 524 (5th Cir.1989) (ERISA plan gave fiduciaries authority to "interpret and construe" the plan document).

It is true that this court is adopting a fairly narrow view of when a grant of discretionary authority is to be found in an ERISA plan document. However, a narrow construction is necessary in a situation, such as the one presently before this court, where determinations on beneficiary claims under the ERISA plan are controlled by a corporation which can profit from a decision to deny benefits. This court shares the concerns, with respect to the potential for conflicts of interest on the part of ERISA fiduciaries, that were expressed by the Third Circuit in *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d at 140–145 and the Seventh Circuit in *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d at 1049–53. A narrow view of when a plan document confers discretionary authority is needed to check the potential for biased decisions on the part of ERISA plan administrators. This court notes that such a potential conflict of interest is not present in the administration of all ERISA plans. Many of the cases cited by the defendants, which employed an arbitrary and capricious standard, may also be distinguished from the present suit because the plan was controlled by a group evenly divided between employer and employees.

Defendants also assert that the arbitrary and capricious standard should be applied in the present suit because that deferential standard is still applicable to "factual findings" made by a plan fiduciary. The defendants place great emphasis on language in the *Firestone* decision which limited the holding to "actions challenging denials of benefits *based on plan interpretations.*" *Firestone*, 109 S.Ct. at 953. The defendants cite post *Firestone* decisions from three district courts that drew a distinction between plan interpretations and factual findings—holding that the arbitrary and capricious standard still applies to judicial review of a fiduciary's factual findings. *See Moshin v. John Hancock Mutual Life*

*Insurance Co.*, No. 88–60415, slip op. at 5–6 (E.D.Mich. Nov. 27, 1989); *Petrilli v. Drechsel*, No. 88–6051, slip op. at 6–8, 1989 WL 106639 (N.D.Ill. Sept. 11, 1989); *Questech, Inc. v. Hartford Accident and Indemnity Co.*, 713 F.Supp. 956, 962–63 (E.D. Va.1989).

It is far from clear in the present case that the defendants' decision to deny benefits was based solely on factual findings. In both the memorandum from Dr. Gerald Blank and rejection letter from Eva Magnano the perceived factual situation was applied to the terms of the contract in the course of making a determination as to whether the plaintiff was entitled to benefits. *See* Affidavit of Fox, Exhibit G and H. As stated by the Supreme Court in *Firestone*, "the validity of a claim to benefits under and ERISA plan is likely to turn on the interpretation of terms in the plan at issue." 109 S.Ct. at 956. Moreover, the Court did not draw any distinction between plan interpretations and factual findings in its *Firestone* decision—holding simply that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard ..." *Id.*

This court holds that the factual findings of an ERISA fiduciary, in the situation presented here, should be subject to *de novo* review for the same reasons that interpretations of the plan document should be subject to *de novo* review. The less deferential standard better protects against potential conflicts of interests and better serves ERISA's goal of protecting " 'the interests of employees and their beneficiaries in employee benefit plans.' " *Id.* 109 S.Ct. at 955 (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)). A *de novo* standard of review of facts is also consistent with two recent decisions of the Sixth Circuit which remanded § 1132(a)(1)(B) cases to district courts with instructions to resolve necessary factual questions under what appears to be a *de novo* standard. *See McMahan v. New England Mut. Life Ins. Co.*, 888 F.2d 426, 431 (6th Cir.1989) ("[W]e are constrained to

remand this case to the district court with instructions to supplement the record concerning this [factual] issue and, in accordance with *Firestone,* to review defendant's denial of benefits under a *de novo* standard."); *Brown v. Ampco–Pittsburgh Corp.,* 876 F.2d 546, 551 (6th Cir.1989) ("Upon remand the district court must determine when the plaintiffs' rights vested.... These are factual determinations for the district court."). Therefore, this court will apply a *de novo* standard of review to determine whether the plaintiff was properly denied benefits.

## B. The Merits

■ Both parties have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. It is well settled that a grant of summary judgment is only proper if the evidence offered demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the lack of a genuine issue of fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and the record "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Viewing the facts as presented by both parties, in the light most favorable to each party, there appears to be a factual dispute with respect to the precise cause of Mr. Guisti's death. The defendants put forward statements from the hospital records concerning coronary artery disease which they believe compels the conclusion that Mr. Guisti had a disease that "caused or contributed" to his death beyond the carbon monoxide poisoning. On the other hand, the plaintiff emphasizes that Mr. Guisti had no previous history of, or prior treatment for, coronary artery disease or similar ailments before the incident in the hunting cabin. Moreover, the affidavit of Dr. Weaver gives the opinion that Mr. Guisti's death "can best be described as occurring from severe myocardial damage caused by inhalation of carbon monoxide (carbon monoxide limiting the oxygen transporting capacity of blood, the resulting oxygen deficiency causing heart muscle injury)." In other words Dr. Weaver, while not being able to rule out coronary artery disease, asserts that the decedent's heart failure was caused by injury to heart muscle as a result of carbon monoxide poisoning. There is a difference in degree here which this court believes needs to be threshed out more thoroughly in order to correctly apply the facts to the terms of the insurance policy.

Denial of summary judgment is especially appropriate in view of the general proposition, accepted by both parties, that "not every condition which weakens a person or predisposes him to illness or death is disqualifying under the language of an [insurance] policy." Defendants' Reply Mem., page 6. When determining "rights and obligations under ERISA regulated plans" courts are to apply federal common law. *Firestone* 109 S.Ct. at 954 (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987). The parties to this motion have each made arguments concerning the proper application of the language of the accidental death insurance policy to the facts of this case. The defendants point to language in *Silverstein v. Metropolitan Life Insurance Co.,* 254 N.Y. 81, 171 N.E. 914 (Ct.App.1930) as providing the rule of decision in this case. The court there defined the type of preexisting condition which precludes recovery of accidental death benefits as a:

disease or infirmity ... so considerable or significant that it would be characterized as a disease or infirmity in the common speech of men; ... of such quality or degree that in its natural and probable development it may be expected to be a source of mischief.

*Id.* at 84, 171 N.E. 914. This is contrasted with a condition that does not preclude recovery which was defined as one:

> so remote in its potential [for] mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency.... If there is no active disease, but merely a frail general condition, so that powers of resistance are easily overcome, or merely a tendency to disease which is started up and made operative, whereby death results, then there may be recovery even though the accident would not have caused that effect upon a healthy person in a normal state.

*Id.* at 84–85, 171 N.E. 914. Though the court does not necessarily adopt this statement of New York law as the federal common law rule of decision, it does reveal that not every disease or medical condition which hypothetically contributes to a death is considered a disease which "causes or contributes" to a death for purposes of making an ERISA benefit determination. Given the fairly delicate legal decision which needs to be made, this court holds that it is the best course to deny both motions for summary judgment, without prejudice, so that a more complete factual record may be developed. Moreover, this court directs that in the event of a subsequent motion the parties provide further briefing on the correct federal common law definition of what constitutes a "disease" which is a "cause or condition" sufficient to prevent an ERISA plan from paying accidental death benefits.

IT IS SO ORDERED.