46 F.3d 1264
 97 Ed. Law Rep. 650, 18 Employee Benefits Cas. 2809,
Pens. Plan Guide P 23,908
 Mark H. JORDAN, on behalf of himself and all others
similarly situated, Plaintiff-Appellant,
v.
RETIREMENT COMMITTEE OF RENSSELAER POLYTECHNIC INSTITUTE,
Contributory Retirement Plan at Rensselaer
Polytechnic Institute, Rensselaer
Polytechnic Institute,
Defendants-Appellees.
 No. 642, Docket 94-7550.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 9, 1994.
Decided Jan. 26, 1995.
 
 Frederick B. Galt, Albany, NY (Herzog, Engstrom & Koplovitz, P.C., of counsel), for plaintiff-appellant.
 John M. Freyer, Albany, NY (Bond, Schoeneck & King, Stephen C. Daley, of counsel), for defendants-appellees.
 Before: FEINBERG, KEARSE and ALTIMARI, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Mark H. Jordan appeals from a May 1994 Judgment of the United States District Court for the Northern District of New York, entered in accordance with a Memorandum-Decision and Order of Magistrate Judge Ralph W. Smith, Jr. Jordan had sued Rensselaer Polytechnic Institute (RPI), the Contributory Retirement Plan at RPI (the Plan) and RPI's Retirement Committee (the Retirement Committee), which administers the Plan, under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1132(a)(1)(B). Jordan's claim was dismissed on cross-motions for summary judgment. The appeal concerns the Retirement Committee's interpretation of a cost of living adjustment (COLA) provision in the Plan. The issues presented are whether the arbitrary and capricious standard should be applied to the Retirement Committee's interpretation of the COLA provision and, if so, whether the Retirement Committee's interpretation violated that standard. For reasons given below, we affirm the judgment of the district court.
 
 I. Background
 
 2
 The relevant facts are not disputed. Plaintiff Jordan retired from his post as a professor at RPI in July 1977 and began receiving benefits under the Plan at that time. Since Jordan's retirement, the Board of Trustees of RPI has amended the Plan periodically to provide cost of living adjustments to Plan members or their beneficiaries. Each ad hoc COLA was less than the full amount of the corresponding rise in the Consumer Price Index (CPI) for the relevant period. The first amendment after Jordan's retirement applied to members who had retired before January 1, 1977 and thus did not affect Jordan. The second amendment became effective July 1, 1980 and provided members (including Jordan) a five percent increase in monthly payments. The third amendment, effective July 1, 1982, provided an additional increase of 3/10 percent for each year or fraction thereof from retirement to June 30, 1982.
 
 A. The 1988 COLA Provision
 
 3
 The subject of this appeal is the interpretation of the fourth amendment to the Plan (Sec. 15.4) and its relationship to the preceding COLAs. Section 15.4 provides:
 
 15.4--Increase Effective July 1, 1988
 
 4
 Monthly retirement benefits for retired Members age 62 or older on July 1, 1988 (and, if applicable, for beneficiaries of such Members), shall be increased (i) first by subsection a. and then by subsection b. for Members retired before July 1, 1983, and (ii) by subsection a. for Members retired on or after July 1, 1983. This increase shall only apply with respect to that portion of a Member's monthly retirement benefit invested in a Fixed Annuity, and to the extent the retired Member was actively employed to an age that would have qualified him for early retirement pursuant to Section 4.2. The effective date of the increase shall be July 1, 1988.
 
 
 5
 a. Year of Retirement Increase
 
 
 6
 Retirement prior to July 1, 1984 2.21%
 
 
 7
 Retirement on or after July 1, 1984 and prior to July 1, 1985 1.67%
 
 
 8
 Retirement on or after July 1, 1985 and prior to July 1, 1986 1.01%
 
 
 9
 Retirement on or after July 1, 1986 and prior to July 1, 1988 0.52%
 
 
 10
 b. An amount equal to two-thirds ( 2/3) of inflationary increases (indexed to the "Consumer Price Index") above three (3) percent for calendar years prior to 1983, but in no event greater than 75 percent of the average salary increase for active Institute employees during the relevant period nor less than five (5) dollars per month.
 
 
 11
 Section 15.4 had its genesis in a report issued in April 1988 by a Special Advisory Committee on Fringe Benefits set up by then-RPI President Stanley Landgraf (the Landgraf Committee). The Landgraf Committee's report proposed, as a formula for calculating future COLAs, an increase in monthly payments by a percentage equal to two-thirds of the annual increase in the CPI in excess of three percent (the Landgraf Formula). For instance, if the CPI increased by nine percent in a given year, Plan members would receive a four percent increase in monthly payments, that is, two-thirds of the six percent increase greater than three percent. By resolution of May 21, 1988, the Board of Trustees of RPI approved application of the Landgraf Formula to cover cost of living increases over the period from the previous increase (effective July 1, 1982) to 1988. This decision led to what is now Sec. 15.4.a, which lists specific COLAs for employees who retired before July 1, 1988. Section 15.4.a assigns percentage increases according to year of retirement. Members, such as Jordan, who retired prior to July 1, 1984 received an increase in monthly benefits of 2.21%.
 
 
 12
 In June 1988, RPI's new president, Roland Schmitt, reconvened the Landgraf Committee (now called the Fringe Benefits Committee), which thereafter recommended that the Landgraf Formula be extended back to all years of retirement for pre-1983 retirees. Accordingly, on December 14, 1988, the Board of Trustees adopted what is now Sec. 15.4.b.
 
 B. The Retirement Committee's Discretion
 
 13
 At the time Sec. 15.4.b was adopted, the Plan provided that the Retirement Committee (not to be confused with the Fringe Benefits Committee) would administer the Plan. Section 10.1 of the Plan stated:
 
 
 14
 The Retirement Committee shall pass upon all questions concerning the application or interpretation of the provisions of the Plan.
 
 
 15
 In February 1989, the Supreme Court decided Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), which held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115, 109 S.Ct. at 956-57.
 
 
 16
 Informed by Bruch, the RPI Board of Trustees amended the Plan, effective July 1989, to provide:
 
 10.2-A--Discretion
 
 17
 a. Notwithstanding any other provision in the Plan, and to the full extent permitted by ERISA and the Internal Revenue Code, the Retirement Committee shall have exclusive authority and discretion to construe any uncertain or disputed term or provision in the Plan, including, but not limited to, the following:(i) determining whether any individual is eligible for any benefits under this Plan;
 
 
 18
 (ii) determining the amount of benefits, if any, an individual is entitled to under this Plan;
 
 
 19
 (iii) interpreting all of the provisions of this Plan; and
 
 
 20
 (iv) interpreting all of the terms used in this Plan.
 
 
 21
 b. The Retirement Committee's exercise of discretionary authority to construe the terms of the Plan, and all its determinations and interpretations, shall
 
 
 22
 (i) be binding upon any individual claiming benefits under this Plan, including, but not limited to, the Member, the Member's estate, any beneficiary of the Member, and any alternate payee under a qualified domestic relations order as defined in Section 414(p) of the Internal Revenue Code;
 
 
 23
 (ii) be given deference in all courts of law, to the greatest extent allowed by applicable law; and
 
 
 24
 (iii) not be overturned or set aside by any court of law unless found to be arbitrary and capricious, or made in bad faith.
 
 
 25
 The crux of the present dispute concerns interpretation of Sec. 15.4.b (sometimes referred to hereafter as subsection (b)). The Retirement Committee contends that subsection (b) effectively modifies earlier increases so that "each eligible retiree [would] hav[e] ... his or her benefit reflect the ... recommended formula for all years from retirement through June 30, 1988." To obtain that result, the Retirement Committee first calculated what the increase in each retiree's monthly benefits would have been if the Landgraf Formula had been applied each year from the date of retirement through June 30, 1988. The Committee next subtracted from that figure the value of increases actually given over the same period, in Jordan's case the 1980 and 1982 increases. Finally, the Retirement Committee added the difference or $5, whichever quantity was greater, to each pre-1983 retiree's monthly benefits commencing July 1, 1988. The increase Jordan received under subsection (b) was $5.69 per month.
 
 
 26
 Jordan contends that the increase he should have received is $37.92 per month. He arrives at this result by incorporating into the base figure to which the Landgraf formula would be applied all prior COLAs, including those received under the second and third Plan amendments mentioned above. In contrast, the Committee's calculations applied the Landgraf Formula to a base that did not include these prior COLAs.
 
 
 27
 In January 1991, Jordan initiated his complaint by a letter to the Retirement Committee. The Committee denied Jordan's claim in April 1991, stating that "[t]he intent underlying the adjustment [in subsection (b) ] was for eligible retirees to have benefits as of June 30, 1988 that would be as great as those they would have been getting had the Committee's two thirds over three percent formula been applied from date of retirement." Jordan appealed from this decision in May 1991, questioning, among other things, the authority of the Retirement Committee to interpret the intent underlying Sec. 15.4.b. In April 1992, the Retirement Committee denied Jordan's appeal. As its authority to interpret Sec. 15.4.b, the Retirement Committee cited Sec. 10.2-A of the Plan. The Retirement Committee concluded that its initial interpretation of Sec. 15.4.b, which had been in place since the adoption of that provision in 1988, was consistent with the intent of the Fringe Benefits Committee and ultimately with the intent of the Board of Trustees in adopting that Committee's recommendation.
 
 
 28
 In December 1992, Jordan brought this ERISA suit against defendants the Retirement Committee, the Plan and RPI in New York State Supreme Court. Defendants removed the suit to the federal district court. In December 1993, pursuant to the consent of the parties, the case was assigned to Magistrate Judge Ralph W. Smith, Jr. See 28 U.S.C. Sec. 636(c) and Fed.R.Civ.P. 73. Both sides moved for summary judgment. In May 1994, the magistrate judge granted defendants' motion, and denied plaintiff Jordan's motion in a Memorandum-Decision and Order. This appeal followed.II. Discussion
 
 
 29
 A. Standard of Review of Retirement Committee's Decision
 
 
 30
 The magistrate judge found that Sec. 10.2-A of the Plan "unambiguously grants the Retirement Committee the highest degree of discretion both to determine eligibility for benefits and to construe the terms of the Plan." Relying on the Supreme Court's decision in Bruch, the magistrate judge concluded that the Retirement Committee's decision should be reviewed under an arbitrary and capricious standard and, under that standard, there was no basis in the record for overturning the Retirement Committee's decision.
 
 
 31
 We review the dismissal of Jordan's complaint on defendants' motion for summary judgment under a de novo standard. E.g., May Dep't Stores Co. v. International Leasing Corp., 1 F.3d 138, 140 (2d Cir.1993).
 
 
 32
 The first issue we must consider is whether the magistrate judge used the correct standard of review of the Retirement Committee's decision. Jordan argues strenuously that the broad degree of discretion that Sec. 10.2-A confers upon the Retirement Committee does not apply here, because the decision at issue was made before Sec. 10.2-A became effective. Jordan contends that the relevant decision for review by the magistrate judge was not the April 1991 dismissal of Jordan's claim by the Retirement Committee, but rather the Retirement Committee's direction of December 1988 to its agent, the Principal Mutual Life Insurance Company (Principal), to begin paying Plan members according to the Retirement Committee's interpretation of the then-recently adopted Sec. 15.4.b. Jordan also argues that even if the decision under review is the Retirement Committee's April 1991 dismissal of his claim, the court should not defer to the Retirement Committee, because Sec. 10.2-A gives the Committee discretion to construe only "uncertain or disputed term[s]," and the terms at issue are neither uncertain nor disputed. Thus, according to Jordan, Bruch required the magistrate judge to review the Retirement Committee's decision under a de novo standard rather than under an arbitrary and capricious standard.
 
 
 33
 The essence of the parties' differences over which version of the Plan applies--the Sec. 10.1 or the Sec. 10.2-A version--turns on whether the December 1988 implementation of Sec. 15.4.b according to the Retirement Committee's interpretation was an actual "decision" in the absence of any dispute at that time. While the parties raise what appears to be an important question, we need not decide it under the circumstances of this case, because even under the earlier version (Sec. 10.1), the Retirement Committee had sufficient discretion to interpret the Plan's terms to warrant review under the arbitrary and capricious standard. Cf. Fiorentino v. Iron Workers Dist. Council Retirement & Pension Plan, 1990 WL 124923 at * 3 (E.D.Pa. Aug. 23, 1990) (declining to decide which version of plan applies, because trustees had discretion to interpret terms under either version).
 
 1. Discretion under Sec. 10.1
 
 34
 Section 10.1 of the Plan was in place at the time Sec. 15.4.b was first implemented in December 1988 and before the Supreme Court's decision in Bruch. As already indicated, Sec. 10.1 provided:
 
 
 35
 The Retirement Committee shall pass upon all questions concerning the application or interpretation of the provisions of the Plan.
 
 
 36
 While Bruch does not explain how specific a grant of discretion must be to overcome the presumption of de novo review and to permit review instead under the arbitrary and capricious standard, post-Bruch decisions discussed below have found language similar to Sec. 10.1 sufficient to support the more deferential standard. We note preliminarily that the Board of Trustees' adoption of a more specific grant of discretion in the post-Bruch Sec. 10.2-A should not preclude use of the arbitrary and capricious standard in reviewing a decision made under the earlier Sec. 10.1. See Diaz v. Seafarers Int'l Union, 13 F.3d 454, 457-58 (1st Cir.1994) (post-Bruch amendment of plan was not "confess[ion]" that earlier version of plan did not grant administrator interpretive discretion). Indeed, it is arguable on the record here that the quick adoption of Sec. 10.2-A after Bruch creates a justifiable inference that the Board of Trustees acted speedily to continue the grant of broad discretion to the Retirement Committee.
 
 
 37
 A review of the relevant cases suggests that even under Sec. 10.1, the Retirement Committee had broad discretion to interpret the Plan so that the arbitrary and capricious standard would apply in any court review. In Masella v. Blue Cross & Blue Shield, 936 F.2d 98, 103 (2d Cir.1991), the defendant plan administrator did not point to any plan provision conferring authority to "interpret" or "construe" the plan, such as Sec. 10.1 in the present case. Accordingly, this court refused to apply an arbitrary and capricious standard of review and distinguished several cases from other circuits in which the grant of discretion at issue did warrant such deferential review. The clauses at issue in the cases Masella distinguished were comparable to Sec. 10.1. For example, we cited with approval Jones v. Laborers Health & Welfare Trust Fund, 906 F.2d 480, 481 (9th Cir.1990), in which the Ninth Circuit applied an arbitrary and capricious standard of review where the plan at issue gave the trustees the power "to construe the provisions of this Trust Agreement and the Plan," and provided that any construction adopted by the Trustees in good faith would be binding. We also cited Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Retirement Fund, 877 F.2d 441, 443 (5th Cir.1989). In Batchelor, the Fifth Circuit affirmed application of the arbitrary and capricious standard where the plan at issue granted trustees " 'full and exclusive authority to determine all questions of coverage and eligibility, ... full power to construe the provisions of this Agreement, [and] the terms used herein' " and "authority to 'interpret the Plan and ... determine all questions arising in the administration, interpretation and application of the Plan.' " Id. at 443.
 
 
 38
 More recently, in Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir.1993), the Third Circuit approved use of the arbitrary and capricious standard where a plan enabled the administrator " 'to interpret and construe the Plan, to direct payment of benefits and to determine all questions relating to eligibility ... for disability income benefits.' " Also, several district courts in this circuit have applied the arbitrary and capricious standard where the relevant language resembled Sec. 10.1 in the instant case. See, e.g., Shapiro v. Joint Indus. Bd. of Elec. Indus., 858 F.Supp. 356, 358 (E.D.N.Y.1994) (" 'The Pension Committee shall have the authority to construe the provisions of this Plan....' "); DiRoma v. National Org. of Indus. Trade Unions Ins. Fund, 1992 WL 123177 at * 6-* 7 (S.D.N.Y. May 27, 1992) (" 'The Trustees shall have full authority to determine eligibility requirements for benefits....' ").
 
 
 39
 Jordan argues that Sec. 10.1, unlike the later Sec. 10.2-A, "simply appoints the Retirement Committee as decision maker [but] does not empower it to construe or interpret uncertain terms." Several courts have held that language which is too general merely "describes who shall decide ... rather than the extent of the Committee's powers." Sisters of the Third Order of St. Francis v. Swedishamerican Group Health Benefit Trust, 901 F.2d 1369, 1371 (7th Cir.1990) (emphases in original) (discussing different interpretations in different courts); see Baxter v. Lynn, 886 F.2d 182, 188 (8th Cir.1989) (provision stating that " 'trustees have the final authority to determine all matters of eligibility for the payment of claims.... merely describes the trustees' mandatory role in accepting or rejecting claims....' "); Guisti v. General Elec. Co., 733 F.Supp. 141, 146 (N.D.N.Y.1990) (provision stating that "[t]he carrier will make all determinations with respect to benefits under this Plan" merely designates the entity with responsibility for adjusting claims). However, unlike the provisions which courts have held inadequate to support an arbitrary and capricious standard of review, the language in Sec. 10.1 confers upon the Retirement Committee the power of "interpretation." In exercising that power, the Retirement Committee necessarily must "evaluate and determine facts," which task is inherently a "judgmental function." Bogue v. Ampex Corp., 750 F.Supp. 424, 428 (N.D.Cal.1990), aff'd, 976 F.2d 1319 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993).
 
 
 40
 While "magic words such as 'discretion' and 'deference' " may not be "absolutely necessary" to avoid a stricter standard of review, Schein v. News Am. Publishing, Inc., 1991 WL 117638, at * 4 (S.D.N.Y. June 24, 1991), their presence, as in this case, is certainly helpful in deciding the issue. The courts that have found that alleged grants of discretion did not justify arbitrary and capricious review have noted the absence of such language. See, e.g., Masella, 936 F.2d at 103 (discretion to interpret terms will not be implied from authority to establish scope of coverage and to define benefits); Heidgerd v. Olin Corp., 906 F.2d 903, 908-09 (2d Cir.1990) ("categorical language" of provision setting out requirements for severance pay eligibility required de novo standard of review); Scalamandre v. Oxford Health Ins. Plans (N.Y.), Inc., 823 F.Supp. 1050, 1058-60 (E.D.N.Y.1993) (lack of "explicit discretion to construe the insurance contract" requires that interpretation be reviewed de novo); Guisti, 733 F.Supp. at 146 ("Terms such as 'discretion', 'deference', or 'power to interpret' are not found in this clause." (emphasis in original)). The grant of interpretive power under Sec. 10.1 is clearly distinguishable from the cases cited.
 
 
 41
 Because we find that Sec. 10.1 did grant the Retirement Committee discretion to interpret the terms of the RPI Plan, we hold that the arbitrary and capricious standard applies even if the decision under review is the Retirement Committee's December 1988 implementation of Sec. 15.4.b.
 
 2. Discretion under Sec. 10.2-A
 
 42
 As we have already suggested, if the relevant decision for review by the magistrate judge was the Retirement Committee's April 1991 dismissal of Jordan's claim, then Sec. 10.2-A also supports application of the arbitrary and capricious standard of review. Jordan contends that the terms of Sec. 15.4 are not "uncertain or disputed" and are thus outside the grant of discretion under Sec. 10.2-A. The principal term at issue is "monthly retirement benefits." Jordan argues that the term refers to benefits being received on the day that Sec. 15.4 was first implemented in 1988, while the Retirement Committee claims that, as to subsection (b), it refers to the original benefit on the date of retirement. The parties debate whether the disagreement as to the meaning of the term "monthly retirement benefits" renders that term uncertain or disputed. The magistrate judge found that it does, and so do we.
 
 
 43
 Therefore, we find that Sec. 10.2-A authorized the Retirement Committee to exercise its interpretive discretion. Thus, under either version of the Plan, the Retirement Committee's interpretation of Sec. 15.4.b should be reviewed under the arbitrary and capricious standard.
 
 
 44
 B. Application of the Arbitrary and Capricious Standard
 
 
 45
 The arbitrary and capricious standard of review is highly deferential to a plan administrator. The question before a reviewing court under this standard is " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (internal citation omitted). The court may not upset a reasonable interpretation by the administrator. See Sansevera v. E.I. DuPont deNemours & Co., 859 F.Supp. 106, 112 (S.D.N.Y.1994); Amond v. Syracuse China Corp., 1993 WL 476490, at * 3 (N.D.N.Y. Nov. 15, 1993); Seff v. NOITU Ins. Trust Fund, 781 F.Supp. 1037, 1043 (S.D.N.Y.1992).
 
 
 46
 In the present case, the magistrate judge found that the Retirement Committee in 1991 considered the alternative interpretations of Sec. 15.4.b and exercised its sound discretion in rejecting Jordan's claim. The magistrate judge pointed out:
 
 
 47
 If [the Retirement Committee] decided in plaintiff's favor, it would have granted plaintiff, and presumably those similarly situated, a double recovery, since pre-1983 retirees had already received cost-of-living adjustments to their pensions in 1978, 1980 and 1982. In addition to providing plaintiff with an arguably unintended windfall, such a double recovery would discriminate against post-1983 retirees, who had not received any cost-of-living adjustments to their pensions prior to the enactment of Sec. 15.4.
 
 
 48
 The magistrate judge acknowledged that Jordan's proffered interpretation of Sec. 15.4.b might be reasonable, but concluded that as between two reasonable interpretations of the same provision the arbitrary and capricious standard requires the court to uphold the administrator's interpretation.
 
 
 49
 The Retirement Committee based its denial of Jordan's claim on its assessment of the intent underlying Sec. 15.4.b as apparently derived from the "legislative history" of that provision. That intent "was for eligible retirees to have benefits as of June 30, 1988 that would be as great as those they would have been getting had the Committee's two thirds over three percent formula [the Landgraf Formula] been applied from date of retirement." As we understand the Retirement Committee's reading of the history of Sec. 15.4.b, since earlier COLAs had been calculated according to various different formulae, Sec. 15.4.b was meant to modify the effect of earlier COLAs in order to reach the intended result. Following implementation of Sec. 15.4.b, all Plan participants would receive benefits as if the same COLA formula had always been applied to all participants, regardless of the date of retirement. It appears that the Retirement Committee thought that the way to achieve this result was to determine what a retiree's increase would have been if the Landgraf Formula had been applied from date of retirement, subtract from that number increases actually received, and add the difference (or $5 if that amount is greater) to the retiree's monthly benefits. Jordan's interpretation of Sec. 15.4.b would undermine that intent, according to the Retirement Committee, by providing a "duplicate increase" to pre-1983 retirees.
 
 
 50
 The Retirement Committee's determination of the intent behind Sec. 15.4.b is amply supported by the "legislative history" of that provision. During its deliberations, the Fringe Benefits Committee, which recommended the substance of Sec. 15.4.b to the RPI Board of Trustees, asked its advisor, the Principal Mutual Life Insurance Company, to illustrate how retroactive application of the Landgraf Formula would affect benefits payable to the earliest living retiree. In response to that request, Principal compared the benefits that the earliest living retiree actually received with the benefits he would have received if the Landgraf Formula had been applied from date of retirement. Principal in turn asked the Wyatt Company (Wyatt), the Plan's actuary at the time, to determine the effect on Plan funding of the proposed retroactive application of the Landgraf Formula. It was determined that retroactive application of the Landgraf Formula would yield an unfunded liability of approximately $950,000, assuming a minimum monthly increase in payments of $5 (i.e., for participants whose calculated increase under the Formula would be less than $5). A study undertaken by the Retirement Committee in considering Jordan's January 1991 complaint revealed that his proposed interpretation of Sec. 15.4.b would yield an additional $610,000 liability. Both the illustration provided by Principal and the cost calculation provided by Wyatt support the Retirement Committee's finding of an intent to implement Sec. 15.4.b as it is presently interpreted.
 
 
 51
 Jordan argues that even if the arbitrary and capricious standard applies, the Retirement Committee's decision was in fact arbitrary and capricious. He offers a number of arguments in support of this position. Jordan first claims that the meaning of the term "monthly retirement benefits" is certain and that reading the words "as of the date of retirement" into that term is arbitrary and capricious. However, the meaning of the term "monthly retirement benefits" is not certain. Reading in the words "as of the date of retirement" is no less reasonable than reading in the words "as of the date of implementation of this section." The plain language of Sec. 15.4 does not clearly require one interpretation rather than the other.
 
 
 52
 Jordan points to expressions of doubt about the meaning of Sec. 15.4.b by some of those involved in administering the Plan. But these are not enough to render the Retirement Committee's interpretation of that provision arbitrary and capricious. These statements do suggest an alternative, reasonable interpretation of Sec. 15.4.b. But, even if that interpretation were as reasonable as the interpretation adopted by the Retirement Committee--and we do not suggest that it is--the arbitrary and capricious standard would require us to defer to the interpretation of the Retirement Committee. See Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan, 698 F.2d 593, 601 (2d Cir.), cert. denied, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).
 
 
 53
 Jordan next argues that the Retirement Committee's interpretation of Sec. 15.4.b is inconsistent with its prior interpretations of earlier, similarly worded COLA provisions. Each of the latter provisions stated, "Monthly retirement benefits shall be increased by ...," and in each of those provisions the term "monthly retirement benefits" was interpreted to mean benefits being received on the day of the increase. The error in Jordan's argument is that it takes Sec. 15.4.b to be a typical periodic adjustment to compensate for increases in the cost of living since the last such adjustment. However, the Retirement Committee's dismissal of Jordan's claim makes clear its view that Sec. 15.4.b is not that kind of adjustment. The adjustment corresponding to the increase in the cost of living since the previous adjustment is provided by Sec. 15.4.a. Section 15.4.b serves an entirely different function. As we understand the Retirement Committee's interpretation, Sec. 15.4.b modifies the effect of the ad hoc COLAs that had been made before adoption of the Landgraf Formula. Assuming that the Landgraf Formula fairly measures increases in benefits needed to meet increases in cost of living, then by this standard earlier increases may have provided inadequate compensation. Recognizing this possibility, Sec. 15.4.b requires the Retirement Committee to modify pre-Landgraf Formula adjustments so that older retirees will now receive the higher monthly benefits they would be receiving if the Landgraf Formula had been applied to previous adjustments. Because, as the Retirement Committee reasonably concluded, Sec. 15.4.b serves a different function than earlier provisions giving COLAs, it was not arbitrary or capricious for the Retirement Committee to interpret similar words in the different sections differently.
 
 
 54
 Nor was it arbitrary or capricious to interpret the term "monthly retirement benefits" differently in relation to subsection (a) of Sec. 15.4 than in relation to subsection (b). The Retirement Committee apparently concluded that subsection (a) serves a function similar to earlier COLA increases. It is a periodic cost of living adjustment, rather than a modification of the effect of an earlier adjustment like subsection (b). It may have been inartful drafting to include the term "monthly retirement benefits" in the paragraph of general instructions preceding the specific instructions of both subsections (a) and (b). However, notwithstanding the appearance of the final provision, the Retirement Committee noted that the substantive proposals that became subsections (a) and (b) were adopted on separate occasions. By resolution of May 21, 1988 the RPI Board of Trustees approved an "updating" of cost of living adjustments "applied to the period 1983-1988." This is the provision that would become Sec. 15.4.a. The Board did not adopt subsection (b) until December 14, 1988, at which time Sec. 15.4 in its entirety was put into its present form. Given this sequence of events, it was not arbitrary or capricious to consider subsections (a) and (b) separately, rather than as two parts of a single, coherent provision.
 
 
 55
 Moreover, while Jordan urges application of Sec. 15.4.b in the same manner as earlier COLA provisions and Sec. 15.4.a, the Retirement Committee found no evidence that the Board of Trustees intended to provide the windfall that this methodology would confer upon pre-1983 retirees vis-a-vis later retirees. Under Jordan's proposed interpretation, post-1983 retirees would receive only the benefit of Landgraf Formula COLAs, while pre-1983 retirees would receive not only that benefit but also the benefit of ad hoc COLAs previously implemented, in Jordan's case in 1980 and 1982.
 
 
 56
 Next, Jordan suggests that it was arbitrary and capricious for the Retirement Committee to base its decision on the intent of the Fringe Benefits Committee as reflected in the studies by Principal and Wyatt, because this was not necessarily the intent of the Board of Trustees. As Jordan observes, there is no evidence in the record before us of what information was provided directly to the Board and what the Board specifically considered. However, contrary to Jordan's suggestion, the lack of direct evidence of what the Board considered in adopting the Fringe Benefits Committee's recommendation did not require the Retirement Committee (or the magistrate judge or this court) to ignore evidence of the evolution of Sec. 15.4.b in the Fringe Benefits Committee. We do not find it arbitrary or capricious for the Retirement Committee to have relied on the "legislative history" of Sec. 15.4.b in the Fringe Benefits Committee, where there was no indication that the Board intended to adopt a provision different from what the Fringe Benefits Committee recommended.
 
 
 57
 Finally, Jordan argues that even though the arbitrary and capricious standard might otherwise apply, we should afford the Retirement Committee less deference than we would another administrator, because "[the Retirement Committee] is not a neutral arbiter, but an interested party." Jordan claims that as an agent of RPI, the Retirement Committee has an interest in keeping the costs of funding the Plan as low as possible, which is in conflict with its fiduciary duty to Plan participants. Also, because two members of the Retirement Committee were also members of the Fringe Benefits Committee, Jordan believes that their impartiality is doubtful.
 
 
 58
 In Bruch, the Supreme Court stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at 115, 109 S.Ct. at 957 (internal citation omitted). However, the simple fact that the administrator of a plan (here, the Retirement Committee) happens to be "an arm of the employer" does not in itself create a conflict of interest. See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees, 970 F.2d 1165, 1173 (3d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992), and cases cited therein. In the present case, the Retirement Committee's consideration of the cost of Sec. 15.4.b anticipated by the Fringe Benefits Committee does not reflect a conflict of interest on the part of the Retirement Committee. The Retirement Committee considered the cost of Sec. 15.4.b merely as a way to double check its determination of what the Fringe Benefits Committee intended in recommending that provision to the Board of Trustees. The Fringe Benefits Committee, relying on the study undertaken by Wyatt, believed it had recommended a provision that would cost approximately $950,000. Jordan's interpretation of subsection (b) would cost approximately $1.5 million. Examining cost simply confirmed the Retirement Committee's conclusion as to how the Fringe Benefits Committee intended Sec. 15.4.b to be applied. This was neither arbitrary nor capricious.
 
 
 59
 Similarly, we do not believe that the two-person overlap in membership between the Fringe Benefits Committee and the Retirement Committee created a conflict of interest warranting limitation of the deference afforded the Retirement Committee. Jordan contends that there is something suspicious about Committee members Clarke and Lawler thus "appear[ing] as both witness and judge." However, Jordan fails to explain why, in their capacity as "witnesses," i.e., members of the Fringe Benefits Committee, Clarke and Lawler would be expected to prefer one interpretation of Sec. 15.4.b over the other. Their alleged "inclination to validate their own prior conduct" might be problematic if Clarke and Lawler were later called upon to determine whether that conduct was justified as measured against some extrinsic standard. However, Clarke and Lawler were merely called upon to determine what the prior conduct was. Further, the principal support for the Retirement Committee's interpretation of Sec. 15.4.b is not Clarke and Lawler's say-so, but rather, the studies by Principal and Wyatt on which the Fringe Benefits Committee apparently relied. We see no reason, therefore, to conclude that the overlap in membership between the two committees requires stricter scrutiny of the Retirement Committee's decision.
 
 
 60
 Judgment affirmed.