273 F.Supp.2d 395 (2003)
William ARMSTRONG, Plaintiff,
v.
LIBERTY MUTUAL LIFE ASSURANCE COMPANY OF BOSTON, Liberty Mutual Group, Liberty Mutual Insurance Company, and Liberty Mutual Insurance Company Group Long Term Disability Income Plan Defendants.
No. 02 CIV. 2450(CM).
United States District Court, S.D. New York.
June 30, 2003.
*396 *397 Michael K. Lambert, Michael K. Lambert, Esq., Wappingers Falls, NY, for Plaintiff.
Michael J. Zaretsky, Chorpenning, Good, Carlet & Garrison, Esqs., New York City, for Defendants.

MEMORANDUM DECISION AND ORDER
MCMAHON, District Judge.
Plaintiff William Armstrong brings this action against defendants Liberty Life Assurance Company of Boston ("Liberty"); Liberty Mutual Insurance Company ("Liberty Mutual"); Liberty Mutual Group, Inc.; and Liberty Mutual Insurance Company Group Long Term Disability Income Plan, challenging Liberty's determination that he is no longer eligible for long-term disability benefits.[1] Before the Court are the parties' cross-motions for summary judgment.
For the following reasons, the defendants' motion is granted in part and denied in part. Plaintiff's motion is denied.

FACTS
Liberty Mutual hired Armstrong in 1977, and he eventually worked there as an Executive Sales Representative. [000682].[2] In September of 1990, Armstrong began to suffer severe pain in his back and legs after pushing a tree-trunk. [000240; 000264]. He was hospitalized and advised of bedrest. When the pain persisted, he visited Dr. Richard J. Radna, a neurosurgeon. Dr. Radna performed lumbar surgery on Armstrong. Id.
Armstrong's condition improved after his surgery, but he continued to suffer from discomfort in his lumbar area, pain in his left thigh, spasms in his left calf, and achiness of his left foot upon walking. [000240; 000171]. Armstrong visited Dr. L. Stephan Kranzler on May 19, 1992. Dr. Kranzler recommended a course of tests, including an MRI and EMG nerve conduction studies. [000171-000173]. Plaintiff had an MRI on May 28, 1992, which found some scarring and a "small, focal, left-sided L4-5 herniation partially obliterating the left epidural recess." [000175].
As of August 31, 1992, plaintiff was unable to continue work due to pain. [001094]. Dr. Kranzler scheduled Armstrong *398 for a steroid injection on September 22, 1992. [000178-000179]. Dr. Kranzler advised that plaintiff could return to work on November 1, 1992 but should not drive more than a half hour per day or engage in any heavy lifting. [000181].
Armstrong met with a Rehabilitation Specialist from Comprehensive Rehabilitation Associates, Inc ("Comprehensive Rehabilitation") on December 9, 1992. [000184]. The Rehabilitation Specialist's report noted Armstrong's eagerness to go back to work, which he did on December 23, 1992. [001097]. Comprehensive Rehabilitation monitored plaintiff's return to work, and plaintiff reported that he experienced discomfort but it was not severe. [000196]. Comprehensive Rehabilitation closed plaintiff's file on January 14, 1993 after concluding that Armstrong had adjusted well to his return to work. Id.
On January 1, 1994, Armstrong awoke with severe pain and numbness in his right arm. [000240]. Armstrong visited Dr. Louis D. Nunez, who determined that plaintiff would probably need neck surgery and referred him to Dr. Radna (who had performed plaintiff's lumbar surgery in 1990). [000199].
Liberty received notice that Armstrong would be absent from work beginning on January 3, 1994. [000782]. Liberty asked Armstrong to supply information about his condition in anticipation that Armstrong would make a claim for short-term disability benefits. Id. Dr. Nunez reported to Liberty that Armstrong was totally disabled for any occupation. [000199]. Plaintiff received short-term disability benefits for the maximum term of twenty six weeks  from January 3 until July 2, 1994. At that time, plaintiff's claim became a long-term disability claim and he continued to receive disability payments. [000757].
Dr. Radna continued to treat plaintiff over that period of time. Dr. Radna determined that plaintiff's cervical spine showed severe cord compression due to a herniated disc, and on February 24, 1994 he performed an anterior cervical discectomy on plaintiff. [000203; 000210]. During periodic visits over the next several months, plaintiff reported that he felt considerable relief of cervical and radicular pain but still suffered some cervical spasms and discomfort in his right hand. [000215; 000217; 000226; 000229].
On August 25, 1994 Dr. Radna sent a note to Liberty indicating that plaintiff was "neurosurgically cleared for full time duties, excluding long distance travel." [000742]. Armstrong returned to work from August 29 through September 27, 1994, when he reported that he was unable to continue work due to pain. [000734; 000729]. In the form that he filled out in support of his claim for long-term disability benefits, Armstrong described his injury as two herniated disks in his neck and reported that he had suffered persistent pain in his neck since the discs were removed on February 24, 1994. [000729].
Plaintiff continued to see Dr. Radna as well as other doctors. On June 27, 1995, for example, Dr. Radna found evidence of "moderate bilateral para-vertebral spasm in the cervical region, with mildly diminished range of motion." [000254]. And on November 28, 1995, Dr. Radna's diagnosis continued as persistent cervical and lumbosacral pain syndrome following decompressive surgery of the cervical and lumbosacral regions. [000261-000262].
At Liberty's request, Armstrong underwent a Neurosurgical Consultation by Dr. Hugh S. Wisoff on December 21, 1995. [000264]. As a part of his consultation, Dr. Wisoff filled out a physical capacities form in which he stated that Armstrong was capable of sitting, walking, and standing for 90%, 20%, and 30%, respectively, of an eight hour day. He also noted that *399 plaintiff was incapable of carrying, driving, traveling, or typing. [000268].
Based on Dr. Wisoff's evaluation, Liberty arranged a "transferable skill analysis" for Armstrong. [000959]. Plaintiff met with Neil Krouse, a vocational rehabilitation counselor. On January 17, 1996, Krouse issued a "Labor Market Survey." [000948]. Based on the survey, Liberty determined that there were occupations that plaintiff was capable of performing. As a result, Liberty advised Armstrong on February 29, 1996 that he was no longer eligible for long-term disability benefits. [000945].
Armstrong appealed Liberty's determination. [000939]. Plaintiff submitted a physical capacities evaluation from Dr. Radna and a radiological report from Dr. Arthur H. Groten. Dr. Radna's evaluation indicated that plaintiff could only sit, stand, or walk for a period of fifteen minutes; could occasionally lift or carry items up to five pounds; and could occasionally bend, squat, crawl, and reach above shoulder level. [001011-001016]. Dr. Groten reported "[d]egenerative and post-operative findings involving the lower cervical spine." [001001]. Upon considering this additional information, Liberty reopened Armstrong's claim and continued his benefits. [000926].
In April of 1996, the Social Security Administration awarded Armstrong Social Security Disability Benefits. [000915-000918]. The award was retroactive from June 1, 1994, and plaintiff's policy with Liberty provided for a reduction of long-term disability benefits in the amount of Social Security benefits. Armstrong submitted a check to Liberty for reimbursement in the proper amount. [000885-000888].
Liberty continued to pay plaintiff long-term disability benefits and periodically sought reports and recommendations pertaining to Armstrong's condition. In December of 1997, Liberty asked Armstrong to have Dr. Radna complete a Physical Capacities Form, Restrictions Form, and Attending Physician's Statement. [000875]. Liberty received the completed forms on February 23, 1998. Dr. Radna noted that Armstrong could sit for long periods of time, but he could neither read and write nor walk for longer than fifteen minutes. [000867].
On April 10, 1998, plaintiff sent Liberty a copy of CAT Scans performed on February 10, 1998. In the accompanying letter, Armstrong informed Liberty that he was undergoing physical therapy. [000855-000857].
On November 6, 1998, Armstrong spoke with an analyst at Liberty and requested a referral to a specialist. [000299]. Plaintiff spoke with an analyst again on November 17, 1998. He described his symptoms, expressed his desire to return to work, and sought direction from Liberty regarding alternate treatment. [000851-000852].
At plaintiff's request, Liberty arranged for him to consult with a physiatrist, Dr. Esin Kaplan, on January 26, 1999. [000842]. Dr. Kaplan noted that Armstrong was not in acute pain, his neck motions were considerably limited, and his upper extremity movements and muscle strength were within the functional range with residual weakness of his right hand grasp and pinch strength. [000796]. Dr. Kaplan also recommended that plaintiff have an MRI. The MRI was conducted on February 9, 1999 and found "residual central osteophyte formation with compression of the spinal cord at C5-6 and C6-7." [000307].
In June of 1999, Liberty decided to hire an investigation company to conduct surveillance of plaintiff. [000821]. The investigation company conducted surveillance on Armstrong on twenty-eight separate occasions between July 8, 1999 and June 3, *400 2001. [000804-000806; 000404-000411]. The investigation company provided Liberty with written reports and video documentation.
Armstrong filled out an "Activities Questionnaire," which Liberty received on July 29, 1999. [000321-000323]. In the questionnaire, plaintiff indicated that he suffered pain when performing many routine life activities. Plaintiff also spoke with a Liberty analyst on August 12 and discussed possible pain management options. [000325].
Dr. Radna saw plaintiff on September 14, 1999. Dr. Radna's diagnosis remained as "chronic cervical and lumbo-sacral pain syndrome." He also noted that plaintiff's level of disability continued to be total. [000327].
Liberty arranged for Dr. Stephen Weinstein, a physical medical and rehabilitation specialist, to perform an "Independent Medical Examination" on plaintiff. Dr. Weinstein conducted the examination on January 24, 2000, and Liberty received his report on February 22, 2000. [000588-000593]. The report indicated that Armstrong was physically limited by his history of cervical and lumbar disc herniations, and that plaintiff's "limitations of physical capacity are permanent in nature." Dr. Weinstein opined, however, that the restrictions placed on him by his attending physician were excessive. He concluded that plaintiff "should be able to read and write with modifications as needed," and "[h]e should be able to drive up to an hour at a time with the ability to pull over and stretch his legs if necessary."
On February 22, 2000, Liberty's medical director, Dr. Edward P. Crouch, spoke with Dr. Radna. [000576-000577]. In his memo memorializing the conversation, Dr. Crouch stated that "it is likely that this insured has significant impairment." He noted, however, that (1) surveillance tapes showed Armstrong moving fluidly and with no difficulty; and (2) plaintiff seemed to be "fairly well developed considering almost six years of receiving disability benefits while having chronic pain." Crouch recommended pursuing further surveillance.
Plaintiff visited Dr. Radna on May 9, 2000. Dr. Radna's diagnosis remained as "chronic cervical and lumbo-sacral pain syndrome." Dr. Radna also noted that plaintiff's level of disability continued to be total and, "in light of the chronicity of the patient's symptoms," permanent. [000336].
Liberty scheduled a "Functional Capacity Evaluation" of the plaintiff. [000522]. Daniel Fishman, an employee of Peak Physical Therapy, performed the evaluation on September 14 and 15, 2000. [000502-000511]. He found that plaintiff demonstrated poor quality of movement due to pain. Fishman concluded that (1) "[w]ork hardening is not recommended because client is primarily pain limited," and (2) Armstrong met the "medium" Physical Demand Level by the standards set by the National Institute of Occupational Safety and Health.
On October 13, 2000, Liberty received a "Vocational Review" report from Mary Paine O'Malley, a vocational/disability consultant. [000460-000462]. The report provided plaintiff's vocational and medical background, set forth his medical and functional status, reviewed Daniel Fishman's functional capacity assessment, and detailed O'Malley's personal contact with Armstrong. She concluded that plaintiff could not fully perform his own occupation without some modifications, but he could potentially perform other jobs in the insurance industry.
In early February 2001, Liberty referred the Administrative Record, as it then existed, to Dr. Gale Brown, Jr. [000438]. Liberty asked Dr. Brown to review the record and render an opinion as to whether the Administrative Record supported *401 continuing plaintiff's long-term disability benefits. Dr. Brown issued a memorandum to Liberty on February 11, 2001. [000430-000437]. Dr. Brown concluded that Armstrong's "reported total disability for any occupation is not supported by the video surveillance, physical capacity evaluation results, expected R/L [restrictions and limitations] for his diagnostic conditions, and the objective physical exam findings put forth by his physicians." [000431]. As a result, she recommended plaintiff's "[t]imely return to work at [his] own occupation or any other light duty occupation, for which he is duly qualified."
Liberty received a Labor Market Survey from Amy Leopold on May 1, 2001. Leopold surveyed employers in the Poughkeepsie, Newburgh, and White Plains areas. She found that given "Mr. Armstrong's current physical limitations, it is questionable whether he could return [sic] Sales work at this time." [000422-000427]. She concluded, however, that alternate employment existed as a website designer, claims adjuster, or underwriter. [000426].
On June 6, 2001, Liberty received a "Supplemental Vocational Review" from Mary Paine O'Malley. [000399-000401]. O'Malley concluded that several occupations existed that Armstrong was qualified for and that were consistent with the functional capacity outlined by Dr. Brown. She also noted that, given his seven year gap in employment, he might benefit from vocational services such as resume development and interview skills training.
In a letter dated June 18, 2001, Liberty advised plaintiff that it had closed his claim as of June 15, 2001. [000379; 000384-000386]. The letter stated that Liberty based its actions on a review of medical records, physical therapy records, diagnostic test reports, the functional capacity evaluation, the surveillance video, and the vocational and transferrable skills analysis.
Plaintiff visited Dr. Radna on June 26, 2001. Dr. Radna's impression remained "that of chronic cervical and lumbo-sacral, musculo-skeletal and radicular pain syndrome." [000367]. In addition, he once again noted that Armstrong's disability was total and permanent. Dr. Radna also recommended an MRI of plaintiff's cervical spine, which was performed on July 11, 2001. [000369].
Armstrong appealed Liberty termination of his long-term disability benefits on July 9, 2001. [000376-000378]. On August 21, 2001, Liberty received plaintiff's submission of additional documentation in support of his appeal. [00080-000369]. Plaintiff also later submitted an additional report from Dr. Radna that resulted from his examination of plaintiff on October 9, 2001. [000071-000077].
Susan W. Colinet, Liberty's Appeal Review Consultant, then referred plaintiff's claim file, together with the new material, to Dr. Brown for further review. [000068]. Colinet specifically asked Dr. Brown to (1) review the July 11, 2001 MRI and comment on its significance; and (2) comment on Dr. Radna's October 9, 2001 examination and conclusions.
Dr. Brown issued a memorandum to Colinet on October 29, 2001. [000063-000067]. She concluded that Armstrong's "diagnostic conditions as stated in my report dated 2-11-01 remain unchanged. There is no new medical information put forth altering the diagnoses as previously outlined." [000063]. Yet Dr. Brown recommended, given Dr. Radna's persistent position regarding plaintiff's total disability, a "peer review with neurosurgery." [000064]. Colinet decided, however, to render a final determination without a peer review. [000062]. She reached this conclusion by considering (1) Dr. Radna's position versus Dr. Brown's previous review; (2) the "Functional Capacity Evaluation"; and (3) *402 "observations through investigation." [000062].
Colinet notified plaintiff of Liberty's position, and the bases for it, in a November 12, 2001 letter. [000059-000061]. Armstrong filed this suit on March 22, 2002. Plaintiff set forth four causes of action in his complaint, alleging that (1) defendants wrongfully denied him benefits he was due under the plan, which is actionable under 29 U.S.C. § 1132(a)(1)(B); (2) defendants breached their fiduciary duties, established under 29 U.S.C. § 1109; (3) defendants failed to provide him with requested documents during his appeal, entitling him to penalties under 29 U.S.C. § 1132(c)(1)(B); and (4) he should be reinstated into Liberty's group life insurance policy. Defendant moved for summary judgment on all four of plaintiff's claims. Plaintiff cross-moved for summary judgment on all claims.

DISCUSSION

I. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

II. Count One

A. Standard of Review

The Supreme Court has held that "a denial of benefits under [ERISA] § 1132(a)(1)(B) must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); see also Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 102 (2d Cir.1991); O'Sullivan v. Prudential Ins. Co., 2001 WL 727033 (S.D.N.Y. June 28, 2001). Where a written plan confers upon an administrator the discretionary authority to determine eligibility, a court must view its decisions with a "strong measure of deference" and may reverse only if the administrator's ultimate conclusions are "arbitrary and capricious." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir.1995).
Plaintiff argues that this Court should apply a de novo, rather than an "arbitrary and capricious," standard of review. He provides two bases for this contention. Plaintiff's first argument arises from the fact that Liberty amended the applicable disability benefits plan as of November *403 1, 1997. Armstrong began to receive disability benefits in 1994, when a policy with an effective date of January 1, 1992 (the "1992 Policy") was in effect. [Colello McGee Aff., Ex. A]. Liberty terminated plaintiff's benefits in 2001, however, when a policy with an effective date of November 1, 1997 (the "1997 Policy") was in effect. [000001].
Plaintiff's first argument fails, however, because both policies grant Liberty Life Assurance discretionary authority. The 1992 Policy provides: "The Plan Administrator has the authority, in its sole discretion, to construe the terms of his policy and to determine benefit eligibility." [Colello McGee Aff., Ex. A, Section VI.N.]. The 1997 Policy provides: "[Liberty] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine eligibility hereunder." [000022].
Even if the 1992 Policy did not grant discretionary authority to the plan administrator, the 1997 Policy would preclude applying a de novo standard of review. Courts that have addressed such circumstances  where an individual becomes disabled under a plan, the plan is amended to confer discretionary authority on the plan administrator, and the plan administrator then discontinues the individual's benefits  have found that the amended plan's provisions mandate review under the "arbitrary and capricious" standard. See Smathers v. Multi-Tool, Inc., 298 F.3d 191, 195-96 (3d Cir.2002); Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1160-61 (9th Cir.2001); Neely v. Pension Trust Fund, 2003 WL 21143087, at *5-6 (E.D.N.Y. Jan. 16, 2003).
Second, plaintiff argues that Liberty Mutual, which was both plaintiff's employer and the Plan Administrator, had a conflict of interest that makes deference inappropriate here. "In order to trigger de novo review of an administrator's decision when the plan itself grants discretion to the administrator, a plaintiff must show that `the administrator was in fact influenced by the conflict of interest.'" Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92 (2d Cir.2000) (quoting Sullivan v. LTV Aerospace & Defense Co., 82 F.3d 1251, 1256 (2d Cir.1996)) (emphasis in Pulvers). Here, plaintiff simply asserts that Liberty Mutual's conflict is "self-evident" because, as plaintiff's employer, it "clearly had an economic incentive to conclude that Plaintiff was no longer totally disabled within them meaning of the applicable plan." [Plaintiff's Sur-Reply 4-5]. Assuming the existence of such a conflict, defendants' financial stake in the determination of plaintiff's claim does not warrant de novo review absent evidence that this conflict in fact influenced defendants' determination. See Fay v. Oxford Health Plan, 287 F.3d 96, 108-09 (2d Cir.2002). Plaintiff offers no such evidence; the "arbitrary and capricious" standard of review will apply.

B. Arbitrary and Capricious Review

In reviewing a claims administrator's decision under the arbitrary and capricious standard of review, the court must grant significant deference to the plan administrator's determination. See Schwartz v. Newsweek, Inc., 827 F.2d 879 (2d Cir. 1987). The court, with appropriate deference to the administrator's determination, must review the Administrative Record to determine "the [the defendants'] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Jordan v. Retirement Committee of Rensselaer Polytechnic Institute, 46 F.3d 1264, 1271 (2d Cir.1995) (quotation marks omitted). The administrator's decision to deny benefits may only be overturned if it was, "without reason, unsupported by substantial evidence or erroneous as a matter of law." Kinstler v. First Reliance Standard Life *404 Ins. Co., 181 F.3d 243, 249 (2d Cir.1999); see also Jordan, 46 F.3d at 1271; Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir.1995) (citing Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir.1993)); Corvi v. Eastman Kodak Co. Long Term Disability Plan, No. 01 Civ. 365, 2001 WL 484008, at *5 (S.D.N.Y. May 8, 2001); Gaitan v. Pension Trust Fund of Pension Hospitalization and Benefit Plan of Electrical Indus., 99 Civ. 3534, 2000 WL 290307, at *4 (S.D.N.Y. Mar. 20, 2000); Kocaj v. Building Serv. 32B-J Health Fund, 1998 WL 633662 (S.D.N.Y.1998). "`Substantial evidence' is `such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995); Todd v. Aetna Health Plans, 62 F.Supp.2d 909 (E.D.N.Y.1999); Glavan v. Building Serv. 32B-J Health Fund, 1997 WL 381789, at *2 (S.D.N.Y. July 10, 1997). Moreover, "[w]here both the plan administrator and a spurned claimant `offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control.'" Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92-93 (2d Cir.2000) (quoting O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir. 1995)); Kocsis v. Standard Ins. Co., 142 F.Supp.2d 241, 252 (D.Conn.2001).

1. Alleged Failure to Consider the Applicable Plan

Plaintiff argues that the 1992 Plan, not the 1997 Plan, applies to his claim. He contends that Liberty's application of the 1997 Plan was necessarily arbitrary and capricious.
Whether the 1992 Plan or 1997 Plan governs Armstrong's claim turns on whether the 1992 Plan vested when plaintiff became disabled. The "general rule" is "that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally amend the plan at any time." Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 77 (2d Cir.1996). However, "[n]othing in ERISA ... forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan ...." Id. at 77. "The questions whether and when benefits vest are matters of contractual interpretation." Feifer v. Prudential Ins. Co. of America, 306 F.3d 1202, 1211 (2d Cir.2002). And it is an issue for a trier of fact so long as the plaintiff can "point to language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits." Schonholz, 87 F.3d at 78.
The 1992 Plan states: "Liberty Reserves the right to amend, alter or terminate this policy at any time." [Colello-McGee Aff., Ex. A, at 21]. Plaintiff argues, however, that the following language in the 1997 Plan renders the 1992 Plan applicable to his claim: "Benefits payable for claims arising prior to the effective date of the new policy [November 1, 1997] will be paid in accordance with the terms of the replaced policy." [000030].
A trier of fact need not determine whether the 1992 Plan vested when Armstrong first became disabled in 1994, because the two plans define the word "disability" in virtually identical terms. Pursuant to the 1992 Plan, "total disability" or "totally disabled" means that "after 18 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupations for which he is or becomes reasonably fitted *405 by training, education, experience, age and physical and mental capacity." [Colello McGee Aff., Ex. A, at 7]. The 1997 Plan provides that "disability" or "disabled" means: "After 18 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." [000005]. There is no material difference between those two statements.
Plaintiff argues that it is irrelevant whether the two plans are identical in all material respects, and Liberty's application of the identical language in the 1997 Plan was inherently arbitrary and capricious. But plaintiff's argument exalts form over substance. Because the two plans' relevant provisions are identical in all material respects, there is no reason to infer that Liberty Mutual Assurance's determination would have differed in any way were it to have applied the 1992 Plan when reviewing plaintiff's claim. Thus, I cannot find that defendants acted arbitrarily and capriciously on this ground.

2. A Review of the Administrative Record

Defendants contend that there were five principle bases for Liberty's determination that plaintiff was no longer disabled: (1) the surveillance videotapes; (2) Dr. Weinstein's independent medical examination; (3) the Functional Capacities Evaluation; (4) the Vocational Review; and (5) Dr. Brown's two opinions (both documented in memoranda).

a. The Surveillance Videos

Defendants hired Claims Verification Incorporated to conduct surveillance on plaintiff. [000565]. Claims Verification produced videotapes of plaintiff's activities and put together written reports documenting the surveillance. Plaintiff remained in his home and out of view much of the time Claims Verification monitored his activities. However, plaintiff was observed at times acting inconsistently with his claimed disabilities. On February 26, 2000, for example, plaintiff was observed driving approximately twenty minutes to a country club. He was seen picking up a gym bag, putting it on his shoulder, bending, and moving his arms and neck. He stayed there approximately an hour and a half before driving home. [000568-000569; Tape 3].

b. Dr. Weinstein's Independent Medical Examination

Dr. Weinstein examined Armstrong on January 24, 2000. In addition to physically examining plaintiff, Dr. Weinstein reviewed a number of records. Dr. Weinstein's report indicates that he reviewed the following: "Request for service, note from Dr. Kaplan on 1/26/99, notes from Dr. Radna between 1994 and 1996, medication/prescription list between 1992 and 1998, physical therapy orders and notes from NYU in 1999, surveillance/investigative report dated 7/14/99, attending physician's statement, labor market survey, physical capacity evaluation from 1996, neurological consultation on 1/9/95, note from Dr. Fischman on 10/18/94, EMG performed on 12/22/94, job physical demand work sheet, job description, multiple X-rays/MRI reports between 1994 and 1999." [000588].
Dr. Weinstein found that "the patient is physically limited by his history of cervical and lumbar disc herniations and subsequent surgeries." [000591]. He determined that plaintiff should not frequently bend, climb, or kneel; plaintiff should not sit for longer than an hour at a time without the ability to change positions after *406 an hour; and plaintiff's driving on the job should be limited. Dr. Weinstein believed that these physical limitations were permanent.
Dr. Weinstein opined, however, that "the patient's restrictions placed on his activities by attending physician is somewhat excessive." He concluded:
The objective evidence does support some restrictions in sitting and standing. However, I believe that the patient is not restricted to sitting or standing or walking for only fifteen minutes in an eight hour day. He should be able to read and write with modifications as needed. He should be able to drive up to an hour at a time with the ability to pull over and stretch his legs if necessary.
According to Dr. Weinsten, plaintiff was capable of spending 50% of an eight hour day sitting, 5% lifting, 50% walking, 50% standing, 5% carrying, 25% driving, 25% traveling, and 25% typing. [000593].

c. The Functional Capacity Evaluation

Daniel Fishman conducted the Functional Capacities Evaluation of plaintiff on September 14 and 15, 2000. Fishman reported that plaintiff "demonstrated poor quality of movement throughout the Functional Capacity Evaluation." [000503]. And as plaintiff's "significant deficits," he listed: "Crouch and kneeling positions, lifting floor-to-waist and overhead lifting. Overhead work."
Fishman opined, however, that plaintiff "tends to restrict himself unnecessarily due to pain" and "limited himself due to pain frequently throughout the Functional Capacity Evaluation." [000503]. As Armstrong's "significant abilities," he listed: "Horizontal lifting (from the two surfaces of equal waist height). Most positional work tasks, such as repetitive squats, sitting and standing tolerance, rotational sit and stand activities, balance and upper extremity coordination." Fishman concluded that plaintiff met the "medium" physical demand level set by the National Institute of Occupational Safety and Health. [000504].
In a September 19, 2000 addendum, Fishman wrote: "Client limited himself throughout the Functional Capacity Evaluation frequently saying `that's enough', `how's your medical malpractice' and `nope' to express his refusal to progress exam limit determinations. This client restricted himself due to pain unnecessarily because, I feel, he has not motivation not to. See motivation comments." [000511]. Fishman's "motivation comments" state:
Client reports that his is perfectly happy to stay at home, collect disability and watch his children play in sporting events. For this reason, I do not believe that he is a work hardening candidate. Furthermore, he reports that he has had extensive physical therapy to maximize his functional ability. This client is being rewarded for staying home and staying injured/disabled. From a psychological perspective on the Magill Pain Questionnaire, the client indicated 14 of 20 pain categories. This indicates that the chronicity of his condition has psychologically affected him.
[000510].

d. The Vocational Review

In developing a Vocational Review, Mary Paine O'Malley reviewed Dr. Weinstein's Independent Medical Evaluation and Fishman's Functional Capacity Evaluation. [000460]. She also spoke with Dr. Weinstein and Fishman, as well as with plaintiff. The Vocational Review, dated October 13, 2000, concluded:
Based on the FCE [Functional Capacity Evaluation] results and my conversation with Mr. Armstrong, Mr. Armstrong does not present as motivated to return *407 to work in any capacity. He appears to have acquired computer related skills including website design; however, he was unrealistic in what situation he could potentially return to work. Based on the FCE results, it does not appear that he could fully perform his own occupation without some modifications. He has not maintained his licenses; therefore, he would not currently qualify for the position with other employers. He could potentially perform alternative positions such as Claims Representative, Customer Services Representative, Inside Sales Representative, etc.; however, wages would more than likely act as an obstacle to his qualifying for higher level insurance related positions such as Risk and Insurance Manger [sic], Department Manager, Office Manager and Training Manager.
[000462].

e. Dr. Brown's Opinions

Liberty Life asked Dr. Brown to review a number of documents and (1) comment on the "appropriateness of treatment and expected treatment plan" for plaintiff's condition, (2) evaluate the Functional Capacity Evaluation, (3) opine whether the objective medical documentation supports plaintiff's total disability for any occupation, and (4) provide her recommendations. [000432]. The resulting memorandum, dated February 11, 2001, indicates that Dr. Brown reviewed the following documents: (a) medical records from Dr. Radna from January 25, 1994 to March 25, 1997; (b) Dr. Weinstein's Independent Medical Evaluation; (c) physical therapy records from March 18, 1999 to April 2, 1999; (d) Dr. Kaplin's medical records from January 29, 1999; (e) Dr. Kranzler's medical records from June 6, 1992 to January 9, 1995; (f) Dr. Fischman's medical records from October 18, 1994; (g) Dr. Wisoff's medical records from December 21, 1995; (h) various diagnostic test reports; (i) various case management notes; (j) various disability forms; (k) the Functional Capacity Evaluation; (l) the video surveillance and reports; and (m) the transferrable skills analysis and labor market survey reports. [000432].
"Based on the claimant's original occupation and associated physical demand requirements," Dr. Brown concluded, "I find no basis precluding this claimant from returning to work at his own occupation, or any other light-medium occupation on a full-time basis, with minor accommodation as stated above." [000431].
Liberty subsequently asked Dr. Brown to review additional records and (1) comment on the significance of an MRI performed on July 11, 2001; (2) determine whether the MRI changed her conclusions from February 11, 2001 recommendations; (3) comment on Dr. Radna's most recent examination on October 9, 2001; and (4) recommend whether or not to conduct another Functional Capacity Evaluation or a peer review. [000064]. Dr. Brown reviewed the following documents in order to render an opinion: (a) medical records from St. Joseph's Medical Center from February 1 to February 5, 1991; (b) Dr. Kanzler's medical records from June 2, 1992; (c) a May 28, 1992 lumbar MRI report; (d) a May 28, 1992 electrodiagnostic test report; (e) a October 4, 1994 lumbar and cervical mylegram/CT; (f) a December 22, 1994 electrodiagnostic test report; (g) a May 14, 1996 cervical spine x-ray report; (h) Dr. Radna's medical records from September 14, 1999 to October 9, 2001; (i) an August 20, 2001 letter from plaintiff's attorney; and (j) a July 11, 2001 cervical MRI report. [000064].
"Based on the additional medical documentation," Dr. Brown concluded, "I find no basis to alter the physical restrictions and limitations recommended in my original memorandum dated 2-11-01. These *408 restrictions acknowledge Mr. Armstrong's cervical and lumbar degenerative spine conditions, as well as his peripheral entrapment neuroapathy." [000063]. Dr. Brown did not recommend another Functional Capacity Evaluation. She did, however, recommend "peer review with neurosurgery" due to "Dr. Radna's persistence on [his] position regarding this claimant's total disability." [000064].

f. Defendants' Decision was not Arbitrary and Capricious

In view of the evidence described above, I find that the Administrative Record in its totality contained sufficient evidence supporting a conclusion that plaintiff could return to work, at least in a light-medium occupation with some modifications. Based on substantial medical documentation (including reports from Dr. Radna and Dr. Weinstein), diagnostic test reports, case management notes, a Functional Capacity Evaluation, video surveillance, and a Vocational Review, Liberty determined that plaintiff was not disabled under the plan.
In addition, Colinet's decision not to follow Dr. Brown's recommendation of a peer review does not render Liberty's determination arbitrary and capricious. Dr. Brown based that recommendation on Dr. Radna's consistent diagnosis of plaintiff. However, while plaintiff's treating physician concluded that plaintiff was totally disabled, his conclusion does not render defendants' determination arbitrary and capricious, given the totality of the record.

III. Count II

Plaintiff's second cause of action alleges that defendants breached their fiduciary duties, established under Section 409 of ERISA, 29 U.S.C. § 1109, by wrongfully terminating Armstrong's long-term disability benefits. I find, however, that ERISA does not provide a basis for plaintiff's second cause of action.
Under 29 U.S.C. § 1132(a)(2), plan participants and beneficiaries may bring civil actions for breaches of ERISA's fiduciary obligations. In Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), however, the Supreme Court held that fiduciary duties imposed by Section 409 run to a plan and not to individual beneficiaries. Id. at 140-44, 105 S.Ct. 3085. Russell therefore bars plaintiff from suing under 29 U.S.C. 1132(a)(2) because plaintiff seeks damages on his own behalf, not on behalf of the Plan. See Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir.1993); see also Crocco v. Xerox Corp., 137 F.3d 105, 107 n. 2 (2d Cir.1998).
29 U.S.C. § 1132(a)(3) provides that an individual beneficiary may seek "appropriate equitable relief" for a breach of ERISA's fiduciary duties. See Varity Corp. v. Howe, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). And, contrary to defendants' reading of Varity, the Second Circuit has held that a plaintiff may bring an action for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) even when another remedy is available under other provisions of ERISA, including 29 U.S.C. § 1132(a)(1)(B). See Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89 (2d Cir.2001); Keir v. UnumProvident Corp., 2003 WL 2004422, at *2 (S.D.N.Y. April 29, 2003).
Yet Devlin does not obviate the requirement that plaintiff seek equitable relief when pursuing a claim under 29 U.S.C. § 1132(a)(3). See Primax Recoveries Inc. v. Carey, 247 F.Supp.2d 337, 341 (S.D.N.Y. 2002) ("Plaintiffs making claims under § 502(a)(3) of ERISA must seek `equitable relief.' 29 U.S.C. § 1132(a)(3)(B)."). Plaintiff seeks the same relief  "$2,992 per month and continuing for so long as he *409 shall remain disabled, but not after his 65th birthday," [Complaint ¶¶ 92, 97]  under Counts I and II. Neither party has briefed this issue, but I am compelled by the Supreme Court's decision in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) to conclude that the relief plaintiff seeks is not equitable in nature. Id. at 713 ("Almost invariably ... suits seeking (whether by judgment, injunction, or declaration)) to compel defendant to pay a sum of money to the plaintiff are suits for `money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." (quoting Bowen v. Massachusetts, 487 U.S. 879, 918-19, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (Scalia, J., dissenting)). As a result, I must dismiss Count II.

IV. Count III

Plaintiff's third cause of action seeks relief under 29 U.S.C. § 1132(c)(1)(B). That provision provides that a court may impose a fine (up to $100 per day) upon a plan administrator who fails to provide information to a participant or beneficiary as required by the statute. Plaintiff alleges that defendants did not comply with 29 C.F.R. § 2560.503-1 by failing to provide information during the administrative appeals process.[3]
On July 9, 2001, plaintiff's counsel requested a complete copy of the administrative file relating to Armstrong's long-term disability claim. [000376]. Defendants responded to plaintiff's request on July 19, 2001. [000372]. Plaintiff alleges that defendants failed to provide two items in the July 19 response: (1) copies of a diary that Armstrong had prepared and provided to Liberty; and (2) documents provided by defendants to Peak Physical Therapy for Fishman's evaluation of plaintiff. [000081]. Plaintiff also identifies, in his opposition to defendants motion for summary judgment and cross-motion for summary judgment, twelve additional items that he alleges defendants failed to provide to him. [Lambert Aff. ¶ 5].
The decision whether to impose a penalty for failure to provide information, as well as the penalty imposed, lies within the discretion of the trial court. See 29 U.S.C. § 1132(c); Devlin, 274 F.3d at 90. "The following factors inform that discretion: (1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary." McConnell v. Costigan, 2002 WL 1968336, at *2 (S.D.N.Y. Aug. 23, 2002) (citations omitted). In addition, the Second Circuit seems inclined toward the view that neither prejudice nor bad faith is a prerequisite to an award of penalties under 29 U.S.C. § 1132(c), though "the law in this Circuit ... is not yet clear on this point." Yoon v. Fordham Univ. Faculty and Admin. Ret. Plan, 263 F.3d 196 (2d Cir.2001).
I first turn to plaintiff's diary and the documents defendants provided to Peak Physical Therapy. Defendants assert that they intended to provide those documents as a part of the Administrative Record they provided to plaintiff on July 19 and, insofar as they did not provide those documents, it was accidental and inadvertent. *410 [Colello-McGee Aff. ¶ 7]. In addition, plaintiff does not assert that he did not possess those documents. Indeed, his August 20, 2001 letter indicates that he had already obtained the documents that defendants had provided Peak Physical Therapy directly from Peak Physical Therapy as of July 19, the day defendants responded to his request for the Administrative Record. [000081]. Similarly, it appears that plaintiff also possessed his diary  he provides the cover sheet that he used to fax the diary to defendants in March of 2000. [000102]. Thus, defendants did not act intentionally or in bad faith; "length of delay" and "number of requests" are irrelevant because plaintiff possessed the information before defendants learned that they failed to provide it; and plaintiff's possession of the documents as of July 19 negates any prejudice that may have resulted due to defendants' failure to provide them. I therefore decline to impose sanctions.
I now turn to the twelve other documents plaintiff alleges defendants failed to provide. Five documents postdate defendants July 19, 2001 response to plaintiff's request for information. [Lambert Aff. ¶¶ 5(c)-(g)]. And plaintiff does not suggest that he made any subsequent requests for information. Thus, I cannot find that defendants failed to provide those documents upon plaintiff's request.
On the record before me, however, I am unable to determine whether defendants' failure to provide the remaining seven documents warrant penalizing them. Defendants unequivocally state that any failure on their part to provide plaintiff with documents in the Administrative Record was an inadvertent mistake, and plaintiff offers no evidence to the contrary. I therefore find that there was no bad faith or intentional conduct involved. But plaintiff simply lists the documents he did not receive without providing any additional information. In particular, plaintiff claims that he did not receive the 1997 Plan (contained in the Administrative Record at 000001-000030). However, defendants' July 19 response to plaintiff's document request indicates that they sent him "a copy of the applicable disability insurance policy." Plaintiff does not explain whether he received no plan at all from defendants, or whether he received a different policy.
I cannot exercise discretion in a vacuum. The parties are directed to explain how consideration of the factors enumerated in McConnell v. Costigan counsel for or against penalizing defendants. They have ten business days from the date of this decision to do so.

V. Count IV

When Liberty denied plaintiff long-term disability benefits, his employment with Liberty Mutual ended and he was no longer covered under Liberty's group life insurance policy. In his fourth cause of action, plaintiff asks this court to reinstate him in the group life insurance policy pursuant to his reinstatement as a disabled beneficiary under the long-term disability policy. Of course, as both parties recognize, plaintiff's success on Count IV is contingent on his success on Count I. Since I have granted defendants' motion for summary judgment on Count I, I must also dismiss Count IV.

CONCLUSION
Defendants' motion for summary judgment is granted as to Count I, Count II, and Count IV. Plaintiff's motion for summary judgment is denied in its entirety. I will decide whether penalties are warranted under Count III when the parties submit additional information, as detailed above.
*411 This is the decision and order of the Court.
NOTES
[1] Plaintiff incorrectly sues Liberty Life Assurance Company of Boston and Liberty Mutual Group, Inc. as, respectively, "Liberty Mutual Life Assurance Company of Boston" and "Liberty Mutual Group."
[2] All citations to the Administrative Record, attached as Exhibit B to the Affidavit of Paula Colello-McGee, include page references.
[3] Plaintiff is not clear as to which portion of the regulation he alleges defendants violated, but he appears to be referencing that part of the regulations stating that (in the context of appealing an "adverse benefits determination") a plan must have in place procedures that "[p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii).