Amelia OWEN, Individually and as Trustee and Beneficiary of the Wade Lupe Construction Company, Inc. Employee Benefit Plan, Plaintiff,

v.

WADE LUPE CONSTRUCTION COMPANY, INC.; and Robert Lupe, as Trustee and/or Administrator of the Wade Lupe Construction Company, Inc. Employee Benefit Plan, Defendants.

No. 02–CV–1048.

United States District Court, N.D. New York.

July 14, 2004.

**148**

Hinman Straub, P.C., Albany, NY (Paul M. Collins, of counsel), for plaintiff.

Gordon, Siegel, Mastro, Mullaney, Gordon & Galvin, P.C., Latham, NY (Melanie J. LaFond, Jeffrey T. Culkin, of Counsel), for defendants.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Amelia Owen ("Owen" or "plaintiff"), individually and as a trustee and beneficiary of the Wade Lupe Construction Company, Inc. Employee Benefit Plan ("Plan"), brought suit against Wade Lupe Construction Company, Inc. ("WLC") and Robert Lupe ("R. Lupe") (collectively, "defendants"), as Trustee and/or Administrator of the Plan,[1] alleging that an interpretation he made of Plan documents resulted in an improper allocation of benefits to her and certain Plan participants, in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").[2]

---

1. R. Lupe, as President of WLC, acted for the company as Plan Administrator. Most references herein to him, therefore, are references to actions he took in that capacity.

2. This is the most reasonable interpretation of the complaint. *See* Docket No. 48, Pl. Mem. in Opp. to Def. Mot. for Summ. Judg., p. 1 ("In this action, Amelia Owen, a trustee and fiduciary under the [plan], seeks to recover the full pension benefits that she and other Plan participants should have received, under the written terms of the Pension Plan.") Owen

Defendants asserted two counterclaims, alleging that Owen: (1) in 1998 or 1999, intentionally overstated her earnings to the Plan in order to secure higher benefits; and (2) under a separate agreement, breached her obligation to take the necessary steps, and incur the costs, for termination of the Plan.

Plaintiff filed a motion for summary judgment on liability with respect to her claims, and for summary judgment dismissing the counterclaims. Defendants filed a motion for summary judgment dismissing the complaint, and opposed her summary judgment motion on their counterclaims. Oral argument was heard on January 23, 2004, in Albany, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

Owen and R. Lupe are sister and brother. Their parents operated a number of family-owned construction and real estate businesses, including WLC. In 1967, WLC, along with various other entities, formed the Employee Benefit Plan, under which a participating employer was defined as WLC, any successor to its ownership, or any other businesses which assume in writing the obligations of the plan. In 1973, Owen's and R. Lupe's father died, followed three years later by the death of their mother. The siblings inherited the businesses in equal undivided shares, resulting in 50% ownership each of WLC, Hexam Gardens Construction Company, Inc. ("HG"), and Wade Lupe Town Houses, Inc. ("WLTH").

Initially, Owen and R. Lupe operated the businesses together, with both serving as officers and directors in all three companies. In 1980, a document entitled "Adoption Agreement" was signed by both, amending the terms of the Plan. In the document, it is stated that "[t]he Employer is doing business under the name of [WLC], [HGC], and [WLTH], 100 Cardell Road, Schenectady, New York 12304." (Docket No. 12, Ex. B.) Section 2.18 of the Plan was "amended to read as follows: The Employer named in the Adoption Agreement which shall also include all members of a controlled group of corporations as further defined in Section 1563(a)4 and e(3)(c)." *Id.*

In 1984, the Plan was again amended, and this time defined "employer" as WLC "and any Participating Employer which shall adopt this Plan; any successor which shall maintain this Plan; and any predecessor which has maintained this Plan." (Docket No. 12, Ex. C, § 1.18.) The Plan provided that a company "may adopt" the Plan "by a properly executed document evidencing such intent and will." *Id.* § 12.1.

In August of 1989, Owen and R. Lupe decided to end their equal ownership in all three companies and divide the companies, as a whole, as equally as possible. R. Lupe attained sole ownership over WLC and HG, and Owen received the same over WLTH. Each resigned from any officer or director position he or she held with the company or companies the other received. This resulted in certain employees of WLC, including Owen, being "terminated" and then placed on the payroll of WLTH. At this time, the two wanted to terminate the Plan altogether, but could not because it was severely underfunded.

The division of assets was memorialized in April of 1991, when the two signed what

---

actually purports to assert three separate causes of action under ERISA. Regardless of whether plaintiff has properly alleged ERISA claims in the *first* and *second* causes of action, it is clear that they are substantively identical to the *third* cause of action, which unlike the other two is expressly asserted under ERISA. Therefore, all three causes of action contain the same essential allegations and will be treated as a single claim.

they refer to as the Omega Agreement. In that document, they agreed that "[t]he pension plan shall not be terminated, and its obligations shall be divided between the appropriate member(s) of [R. Lupe's] Group and [Owen's] Group." (Docket No. 12, Ex. D, § 3.5.)

On June 30, 1994, R. Lupe, acting as Plan Administrator, provided plan participants with notice of intent to terminate the Plan, and froze benefits as of that day. Everyone agreed termination was in the best interests of all involved, but IRS issues prevented it from then occurring.

In 1995, the Plan was again amended, but the definition of "employer" stated in the 1984 amendment remained unchanged. The amendment to the Plan, however, was made retroactive to July 1, 1989, because, according to defendants, that is the day on which the employees "terminated" on August 11, 1989, were considered to have ceased working for WLC. The Plan Administrator was given "the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan," as well as the authority to "reconcile any inconsistency" in the Plan. (Docket No. 12, Ex. E, § 2.6.)

After the IRS issues were resolved, R. Lupe again issued the notice of intent to terminate the Plan. That same day, WLC passed a corporate resolution, purporting to terminate the Plan. WLC then retained an actuary, who prepared calculations for the distribution of benefits to participants. The initial calculations proceeded on the assumptions that only WLC was a participating employer at the time the Plan was terminated, and that Owen and her WLTH employees had their participation terminated as of July 1, 1989. In other words, after July 1, 1989, R. Lupe and his employees at WLC continued to accrue benefits, but Owen and her employees did not.

R. Lupe sent the distribution calculations to Owen. Predictably, and perhaps understandably, she vehemently objected to the distributions, and requested alternative calculations on the assumption that all of the companies were participating employers at the time benefit rates were frozen in 1994. The actuary presented the siblings with three alternatives, the first of which was preferred by R. Lupe and involved crediting Owen's employees with service up to August 11, 1989, the date the two decided to divide up the companies. The third option, preferred by Owen, involved crediting her employees for service up to the date of the benefit freeze in 1994.

R. Lupe, as Plan Administrator, selected the first option ("Option One") and this suit followed.

## III. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. Owen's Claim—ERISA

Owen frames this claim as one for breach of fiduciary duty pursuant to 29 U.S.C. § 1104. The focus of the claim is on whether R. Lupe, as Plan Administrator, properly interpreted the plan documents in selecting Option One. The viability of plaintiff's claim, in this particular case, turns on the proper standard of review to be employed. Although suspicion is expressed as to the correctness of R. Lupe's interpretation, under the applicable standard, summary judgment in defendants' favor on plaintiff's claims is appropriate.

#### 1. Standard of review

An administrator's interpretation of plan documents in determining eligibility for benefits is subject to a *de novo* standard of review unless he is given the proper authority "to construe the terms of the plan." *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The burden of proving that such authority or discretion has been granted by the plan is on the administrator. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999).

Here, defendants have carried their burden of demonstrating that R. Lupe, as Plan Administrator acting on behalf of WLC, was given the requisite amount of discretion such that an abuse of discretion standard is applicable to any interpretations of Plan documents he made. Specifically, Section 2.6 of the latest amended Plan provided him with "the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan," as well as the authority to "reconcile any inconsistency" in the Plan. (Docket No. 12, Ex. E, § 2.6.) The Second Circuit has held similar language to be sufficient for invoking the less intrusive standard of review. *See O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995) (finding sufficient plan language stating that "[t]he trustee shall determine any questions arising in the administration, interpretation, and application of the Plan, which determination shall be binding and conclusive"); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 763–64 (2d Cir.2002) (finding sufficient plan language that afforded administrator/fiduciary discretion " 'as to the proper interpretation of the Plan with respect to eligibility for benefits or otherwise' ") (citing *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan*, 76 F.3d 462, 466 (2d Cir.1996) (finding sufficient language giving trustees power to "resolve all disputes and ambiguities relating to the interpretation of the Plan, and application of the terms of the Plan to any circumstances"); *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1269–71 (2d Cir.1995) (finding sufficient plan language giving retirement committee the authority to "pass upon all questions concerning the application or interpretation of the provisions of the Plan," the power of "interpretation," and the duty to perform the "judgmental function" of ."evaluat[ing] and determin[ing] facts") (internal quotations and citations omitted)).

As a general rule, because defendants carried their burden, R. Lupe's decision to select Option One will not be disturbed unless it is arbitrary and capricious, *Burke v. Kodak Ret. Income Plan,* 336 F.3d 103, 109 (2d Cir.2003), "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest," *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. An exception to applying the arbitrary and capricious standard of review in this situation can be invoked, however, when it is demonstrated that the administrator had an actual conflict of interest, and that such conflict in fact "affected the reasonableness of the administrator's decision." *See Whitney v. Empire Blue Cross & Blue Shield,* 106 F.3d 475, 477 (2d Cir. 1997) (citing *Sullivan v. LTV Aerospace & Def. Co.,* 82 F.3d 1251, 1256 (2d Cir.1996)). The burden of proof on these two requirements falls to the plaintiff. *Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d 89, 92 (2d Cir.2000). If a plaintiff can carry this burden, a *de novo* standard of review is applied when assessing the challenged interpretation. *Sullivan,* 82 F.3d at 1255. If a plaintiff cannot carry this burden, then any conflict the administrator has is simply one more factor in determining whether the challenged decision was arbitrary and capricious. *Pulvers,* 210 F.3d at 92.

Here, Owen has carried her burden in demonstrating that R. Lupe had an actual conflict of interest. It is important to note the peculiar circumstances present in this case. There is no question that the Plan was severely underfunded. It also appears that no contributions were made, by any company, to the Plan in the last decade. Thus, once the Plan was terminated, the contributions were to be divided according to participation or coverage of the employees. R. Lupe had a financial stake in the decision to select Option One, both individually and as the head of WLC, because, in effect, the earlier he interpreted the Plan to cut off Owens's and her employees' benefits, the larger the piece of the pie he and his employees received upon the Plan's termination.

As noted, however, demonstrating the existence of a conflict of interest is not enough to invoke a *de novo* review of R. Lupe's decision to select Option One. Owen must also demonstrate "that 'the administrator was *in fact* influenced by the conflict of interest.'" *Pulvers,* 210 F.3d at 92 (emphasis in original) (quoting *Sullivan,* 82 F.3d at 1256). Therefore, "financial stake in the determination of [Owens's] claim [alone] does not warrant *de novo* review absent evidence that this conflict in fact influenced [R. Lupe's] determination." *See Armstrong v. Liberty Mut. Life Assurance Co. of Boston,* 273 F.Supp.2d 395, 403 (S.D.N.Y.2003). Aside from speculation, plaintiff can point to no evidence that the conflict of interest in fact affected R. Lupe's decision.

The policy reasons behind requiring this in fact showing are sound. Were the requirement eliminated, district courts would be deluged with claims seeking a *de novo,* almost second opinion-like review of Plan Administrators' decisions, on the basis of only the existence of a structural conflict, which Administrators understandably have on a frequent basis. This is not to say, however, that the Second Circuit has not recognized that demonstrating the in fact showing will almost always be an insurmountable hurdle for plaintiffs, short of irrefutable evidence that the Administrator has stated, "'[i]n view of [my] conflict,'" "this interpretation is adopted." *See DeFelice v. Am. Int'l Life Assur. Co. of N.Y.,* 112 F.3d 61, 66 n. 3 (2d Cir.1997).

It is also not to say that in fact showing has been embraced, at any appreciable level at all, by other Courts of Appeals.

In the Eleventh Circuit, for example, after a court finds from on a *de novo* review that the Administrator's decision was incorrect, and a plaintiff demonstrates a substantial structural conflict of interest, the burden is shifted to the *Administrator* to demonstrate that such conflict did not affect his decision. *See Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1566–68 (11th Cir.1990) ("That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries").

Most Circuits, arguing that the arbitrary and capricious standard is inherently flexible to allow for different circumstances, assess the Administrator's decision under an arbitrary and capricious standard, but "decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996);[3] *see also MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir.2003) (citing *Vega v. Nat'l Life Ins. Serv. Co.*, 188 F.3d 287 (5th Cir.1999) (en banc)); *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 392 (3d Cir.2000) (extensively reviewing different approaches); *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir.1998); *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir.1993) ("We hold that when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rath-er, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict").

It is here opined that the formulation of the two-pronged standard of review for a conflicted administrator's decision, though grounded in sound and important policy reasons, could benefit from the injection of more flexibility—especially given the Second Circuit's admission that proving the in fact requirement will almost be impossible—to account for situations, such as the instant one, where the conflict of interest goes beyond the merely structural, and the Administrator is forced to make an up or down decision that affects a smaller group of participants and involves the possibility of exercising discretion in favor of one portion of the group to whom he may feel more loyalty and, indeed, a greater need to keep content, given that this portion works for him while the other does not. As it stands now, however, the in fact showing—with all its benefits but also with all its rigidity—remains the law of the Second Circuit. Accordingly, R. Lupe's decision to select Option One will be afforded no less deference than is normal under the traditional arbitrary and capricious standard.

### 2. *Application of Standard of Review*

 A decision or interpretation is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."

---

**3.** The court in *Chambers* actually cited *Sullivan* as embracing this view. In so doing, however, the court did note parenthetically that *Sullivan* would only abandon an arbi-trary and capricious review if " 'the conflict of affected the choice of a reasonable interpretation.' " 100 F.3d at 825.

*Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995). "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker and requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995) (internal quotations and citations omitted). If both sides "offer rational, though conflicting, interpretations of plan provisions," the administrator's interpretation controls, *O'Shea,* 55 F.3d at 112, "whether or not the Court would have made the same interpretation upon a *de novo* review," *Coram Healthcare Corp. v. Wal–Mart Stores, Inc.,* 238 F.Supp.2d 586, 591 (S.D.N.Y.2002). In other words, when operating under the arbitrary and capricious standard of review, a court "may not upset a reasonable interpretation by the administrator." *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir.1995).

 The central issue involved in this case is whether it was arbitrary and capricious for R. Lupe to select Option One. The decision to select Option One is, in turn, inextricably linked to the question of when WLTH's, and its employees', participation in the Plan ended. Defendants urge that such participation ended on August 11, 1989. Owen claims it did not end until June 30, 1994, when the benefit rates were frozen. Though disagreement is expressed with R. Lupe's decision, and doubt is abundant as to whether the arguments here made in support of that decision were not undertaken some measure of ad-hoc document examination, it cannot be said that selecting Option One was arbitrary and capricious.

Owen argues that the 1980 adoption agreement, which was signed on behalf of all three companies, lists each of the three companies as an "employer." The 1984 amendment, by including within its defini-

tion of employer any corporation that shall assume in writing the obligations associated with the Plan, she says maintained WLTH's identity as an employer. She argues that her employees were still covered after the 1989 separation, because they went from one covered employer (WLC) to another (WLTH). The 1991 Omega Agreement expressly states that the Plan was not going to be terminated, and that the obligations of the Plan were to divided appropriately between her group of companies (which included WLTH) and his group of companies (which included WLC). The 1995 amendment contains the same definition of employer used in the 1984 amendment, and, therefore, because WLTH adopted the agreement in 1980, Owen claims WLTH was still an employer under the 1995 amendment. Therefore, according to her, the plain terms of the Plan documents prohibited the Administrator from determining that WLC was the only participating employer under the Plan and that she and her employees stopped accruing benefits once they were "terminated" from WLC.

Defendants argue that, under the 1980 adoption agreement, all three companies were indeed named, but they comprised the employer only as a controlled group, and were therefore considered a single employer. In 1989, the companies separated and Owen and her employees were terminated from WLC and transferred to the payroll of WLTH. At that point, WLTH, as a separate entity, had the obligation to adopt the Plan on its own in order to continue to be considered an employer under the definition in the 1984 amendment. The definition of employer was restated in the 1995 amendment, which was made retroactive to July 1, 1989, the date on which the terminated employees were considered to have ceased working for WLC. During no time between 1989 and 1995 did WLTH adopt the obligations of the Plan in writing, and at no

time during that time period did it fit within the other definitions of employer.

Both of these interpretations, though competing, are reasonable. R. Lupe's decision may not be disturbed, therefore, unless he incorrectly interpreted the law. The only legal interpretation he makes is that, until 1989, the three companies controlled by him and Owen were a controlled group and therefore considered a single employer. Businesses are "commonly controlled if the same five or fewer persons own a controlling interest (i.e., 80%) in each business and, considering only the identical ownership in each entity, the relevant persons are also in effective control (i.e., 50%) of each entity." *I.L.G.W.U. Nat'l Ret. Fund v. Vaco Holding Co.*, 950 F.Supp. 598, 602 (S.D.N.Y.1997).

There is no dispute that the corporate structures, in terms of ownership and control, of all three relevant companies fit this definition prior to the August 1989 division of companies between Owen and R. Lupe. Furthermore, that the "employer" in the Plan was a controlled group within the meaning of this definition has appeared in every version of the Plan since the siblings first amended it in 1980. Therefore, R. Lupe's determination that the three companies comprised a controlled group prior to the August 1989 division of assets is reasonable. Accepting, therefore, this determination as correct, his determination

that, because the singular "employer" after 1989 no longer referred to a group of companies, but rather to just WLC as the only named company, also cannot be said to be arbitrary and capricious. In turn, it was not arbitrary and capricious to interpret the Plan documents as requiring Owen, on behalf of WLTH, to assume in writing the obligations of the Plan—not as part of a controlled group, as she did in 1980, but as a separate entity. Thus, although Owen is correct that the Plan did not preclude written adoption of the Plan, such that participating employer status could be attained, it was not arbitrary and capricious for R. Lupe to determine that she did not do so after the August 1989 separation. Accordingly, though the result may have been different had the *de novo* standard of review applied,[4] R. Lupe's interpretation that Owen's and her employees' ended in August 1989 cannot be said to be arbitrary and capricious.

### C. Defendants' Counterclaims

Such conclusion does not, however, entirely dispose of this case, as defendants have asserted two counterclaims. Both counterclaims will be dismissed.

#### 1. First Counterclaim: Defrauding the Plan

In the *first* counterclaim, defendants claim that Owen defrauded the Plan by

---

4. Had *de novo* review been employed, perhaps because of the blatant nature of the actual conflict of interest here, the outcome of this case would be different. While it was not arbitrary and capricious to determine the Plan documents as requiring WLTH to adopt the Plan in writing after the 1989 separation, it is more reasonable to conclude that R. Lupe felt and acted as if Owen and her employees remained participants thereafter. It is difficult to think of why else, for example, WLC would continue to maintain payroll records of Owen and her employees in 1993 and 1994, when their Plan participation and employment with WLC ended in 1989.

The conclusion that R. Lupe did not act arbitrarily and capriciously is not reached lightly and without sympathy for the plight of Owen and her WLTH employees. Though the apparent breakdown in civility can likely be attributed to both parties, the unwillingness of R. Lupe—as a sibling, if not as a matter of fairness—to be more amenable to his sister and her employees, who had worked with and/or for him for some time, is an unfortunate result given the time and energy their parents put into making and building the companies the two children inherited.

providing false salary information in order to inflate the benefits allocated to her Plan account. Though they claim that she reported a salary of $65,000 but was only entitled to benefit calculations based on a salary of $49,000, the only evidence to which defendants point as support for this claim are documents internally generated by WLC. (Docket No. 43, Dep. Ex. 27.) Even assuming the correctness of the WLC documents as to her actual salary, without companion evidence that she misreported her salary in the relevant Plan years,[5] the *first* counterclaim cannot survive summary judgment.

### 2. *Second Counterclaim: Breach of Contract*

Unlike the *first* counterclaim, which is asserted under ERISA, defendants assert no federal statutory authority under which the *second* counterclaim is alleged. Therefore, it is appropriate and permissible to decline supplemental jurisdiction over this apparently state law claim, as no federal claims remain to give rise to proper federal question jurisdiction.

Even assuming, however, that such was not the case, and that preemption is not appropriate, dismissal of the *second* counterclaim is nonetheless warranted. In the *second* counterclaim, defendants argue that Owen breached her agreement to "undertake and be responsible for closing out the [Plan] at her sole expense and cost," forcing WLC to incur "substantial costs and expenses." (Docket No. 14, ¶¶ 46–48.) The agreement to which defendants cite is a "Summary Checklist" of "Outstanding Items" related to the "Lupe–Owen Asset Separation," dated August 22, 1991, and

prepared by Jeffrey Yablon, an attorney working for Owen. (Docket No. 44, Dep. Ex. 4.) Next to Item "I. Pension Split," appears the initials "JLY." *Id.* at p. 2.

The document, aside from not indicating that Owen herself is responsible for the split, or even delineating what "Pension Split" means, is signed by neither Owen nor her attorney. There is no discussion of costs relating to the termination of the plan or which party was to bear them. Defendants have pointed to no other compelling evidence indicating such an agreement existed. Accordingly, this counterclaim will also be dismissed.

### D. *Attorney's Fees*

■■■■■ Defendants in their motion for summary judgment on Owen's ERISA claim also seek attorney's fees pursuant to 29 U.S.C. § 1132(g)(1), which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The Second Circuit has identified five factors to be considered in determining whether to award attorney's fees to a party under Section 1132(g)(1), *see Krizek v. Cigna Group Ins.*, 345 F.3d 91, 102 (2d Cir.2003) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987)), none of which particularly favor defendants such that the rather extraordinary remedy of attorney's fees against a losing ERISA plaintiff is appropriate. *See Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir.2000) (noting that case law strongly counsels against awarding fees in favor of prevailing defendants and against ERISA plaintiffs, especially where claim was color-

---

**5.** A Plan participant's benefits are calculated using the five consecutive Plan years prior to termination. Because Owen is considered "terminated" as of August 11, 1989, *supra*, the relevant Plan years are 1984–1989. The only evidence submitted by defendants that can even arguably be said to be a representa- tion she made to the Plan regarding salary is a document, again internally produced by WLC and unsigned by Owen, that her salary for 1993–1994—four years after the last relevant Plan year—was $65,000. (Docket No. 43, Dep. Ex. 27.)

able even though unsuccessful). Suffice it to say that, as demonstrated *supra,* Owen had a good faith basis for a colorable claim and, given that, likely at the time had a duty to bring an ERISA claim against defendants in her capacity as a fiduciary. There is no evidence she maintained this suit in bad faith. In such a situation, at least one of the factors is no longer "merely neutral, but weighs strongly against granting fees to the prevailing defendant." *Id.* at 31. Moreover, defendants' prevailing worked a common benefit in favor of some—but certainly not all—Plan participants. Defendants are not entitled to attorney's fees and costs.

## IV. CONCLUSION

While it is certainly not a conclusion that would have been reached in this forum on *de novo* review, it cannot be said that R. Lupe's interpretation that Owen's and her employees' participation in the Plan ended in August 1989 was arbitrary and capricious. On the other hand, defendants' counterclaims are without merit.

Accordingly, it is

ORDERED that

1. Plaintiff Amelia Owen's motion for summary judgment on liability is DENIED;

2. Defendants' motion for summary judgment liability is GRANTED;

3. Plaintiff Amelia Owen's motion for summary judgment on defendants' counterclaims is GRANTED; and

4. The complaint and counterclaims are DISMISSED, without attorney's fees or costs.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.